# State of New York Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 74
The People &c. ex rel. Fred
Johnson,
  Appellant,
   v.
Superintendent, Adirondack
Correctional Facility, et al.,
   Respondents.
-----------------------------------------
No. 75
The People &c. ex rel. Angel
Ortiz,
  Appellant,
   v.
Dennis Breslin, &c. et al.,
   Respondents.


Case No. 74:
Denise Fabiano, for appellant.
Brian D. Ginsberg, for respondent.

Case No. 75:
Will A. Page, for appellant.
Ester Murdukhayeva, for respondents.
Appellate Advocates, amicus curiae.


FAHEY, J.:

In these appeals, we consider constitutional challenges to the practice of temporarily

confining level three sex offenders in correctional facilities, after the time they would

otherwise be released to parole or postrelease supervision (PRS), while they remain on a

waiting list for accommodation at a shelter compliant with Executive Law § 259-c (14).  In each case, we conclude that there was no constitutional violation.

I.

In 2009, petitioner Fred Johnson, who had multiple prior sexual abuse convictions for rubbing his penis against women's buttocks on subway trains in New York City, pleaded guilty to persistent sexual abuse.  He was sentenced to an indeterminate prison term of two years to life.  Johnson had a history of incarcerations followed by recidivism.  Following a 2004 conviction of the same crime, he had been designated a level three sex offender under the Sex Offender Registration Act (SORA), and had been placed on lifetime parole supervision.

Johnson appeared before the New York State Board of Parole in June 2017, seeking discretionary parole release.  He maintained that a prison sex offender program had taught him to control his judgments and behavior.  The Parole Board granted Johnson an "open parole date" of August 10, 2017.[1]

Based on his SORA risk level designation and the crime for which he was serving a sentence,[2] Johnson was subject to the requirement of the Sexual Assault Reform Act

---

[1] An open parole date or "open date is the earliest possible release date" (DOCCS *Community Supervision Handbook* at 15, available at https://doccs.ny.gov/system/files/documents/2019/05/Community_Supervion_Handbook.pdf [last accessed November 16, 2020]).  The New York State Department of Corrections and Community Supervision *Community Supervision Handbook* states that "[i]f the Board grants release, this is known as an 'open date.'  This date is contingent upon the inmate receiving an approved residence in accordance with established residency restrictions and local laws" (*id.* at 12-13).

[2] See *People ex rel. Negron v Superintendent*, — NY3d — (2020) (decided today).

(SARA) that he not reside within 1,000 feet of a school (*see* Executive Law § 259-c [14]; Penal Law § 220.00 [14] [b] [defining "school grounds"]; *People v Diack*, 24 NY3d 674, 682 [2015]). In his conditions of parole release, Johnson agreed that he would not be released until a residential address "located outside the Penal Law definition of school grounds" had been identified and approved.

Johnson's own first suggestion of where he might live was not compliant with SARA's requirements and, therefore, he asked to be released to the New York City Department of Homeless Services (NYCDHS) shelter system. The New York State Department of Corrections and Community Supervision (DOCCS) added Johnson to its internal waiting list of inmates seeking SARA-compliant housing at one of the NYCDHS shelters, only a few of which meet SARA's geographic restriction. Johnson was kept in custody at Adirondack Correctional Facility until a bed in a SARA-compliant shelter became available for him in November 2019.

In November 2017, Johnson filed a petition for a writ of habeas corpus, pursuant to CPLR article 70, seeking immediate release from incarceration, and naming the Superintendent of Adirondack Correctional Facility and DOCCS as respondents. In his as-applied constitutional challenge, Johnson contended that "applying SARA's housing restrictions to keep him in prison, after an open parole date for his release has been set, violates substantive due process by infringing on his fundamental right to be free from confinement." Notably, Johnson did not contend that SARA's restrictions on where he can live after release are unconstitutional.

DOCCS answered the petition and countered that Johnson was under a sentence of life imprisonment and had no fundamental substantive due process right to be released from prison. The agency maintained that a rational basis justified its application of SARA restrictions.

Supreme Court denied Johnson's writ in March 2018. The Appellate Division affirmed in July 2019 (174 AD3d 992 [3d Dept 2019]). Johnson appeals as of right pursuant to CPLR 5601 (b) (1).

II.

Petitioner Angel Ortiz pleaded guilty to robbery in the first degree and attempted sexual abuse in the first degree in 2008. It was his second criminal conviction for trying to coerce a person into having sex with him by means of physical force; his prior victim, a 13-year-old boy, and his 2008 victim were both able to flee before any sexual contact occurred. Ortiz was sentenced to a determinate sentence of 10 years' imprisonment, to be followed by five years' PRS. Ortiz was designated a sexually violent level three sex offender under SORA and, like Johnson, was considered to be subject to SARA's residency requirement while on PRS. The Board of Parole provided Ortiz with notice of the residency restrictions.

The maximum expiration date of Ortiz's term of imprisonment was March 4, 2018. At that time, DOCCS transferred Ortiz to begin the PRS portion of his sentence in a residential treatment facility (RTF) at Fishkill Correctional Facility, invoking its authority to "impose as a condition of post-release supervision that for a period not exceeding six months immediately following release from the underlying term of imprisonment the

person be transferred to and participate in the programs of a residential treatment facility" (Penal Law § 70.45 [3]).[3] The following month, DOCCS transferred Ortiz to the RTF at Queensboro Correctional Facility.

Ortiz sought to reside after his release in New York City, where he had spent most of his life and where his close relatives lived, but the addresses he suggested were not SARA-compliant. When DOCCS transferred Ortiz to RTF housing, it placed him on its waiting list of inmates seeking SARA-compliant housing at an NYCDHS shelter. Ortiz was released to a SARA-compliant shelter on Wards Island in November 2018.

In June 2018, Ortiz, like Johnson, filed a petition for a writ of habeas corpus, challenging his confinement. He named the Superintendent of Queensboro Correctional Facility and DOCCS as respondents. In his as-applied challenge, Ortiz maintains that, by confining him, DOCCS violated both his substantive due process "right to serve his term of postrelease supervision in the community" and the constitutional prohibition on cruel and unusual punishments. Like Johnson, Ortiz does not contend that SARA cannot lawfully restrict where he may live after release.

As an alternative to his request for immediate release, Ortiz asked that he "be allowed to treat Queensboro [Correctional Facility] as a residence—albeit with a curfew, like other shelters—rather than a prison."

---

[3] An RTF is "[a] correctional facility consisting of a community based residence in or near a community where employment, educational and training opportunities are readily available for persons who are on parole or conditional release and for persons who are or who will soon be eligible for release on parole who intend to reside in or near that community when released" (Correction Law § 2 [6]).

DOCCS responded that because Ortiz was not in compliance with the mandatory condition of the SARA residency requirement, he had no fundamental substantive due process right to be released from prison and that no violation of the Eighth Amendment had occurred. The agency, as in *Johnson*, insisted that a rational basis justified its application of SARA.

Supreme Court denied Ortiz's writ in September 2018. The Appellate Division affirmed in May 2020 (183 AD3d 577 [2d Dept 2020]).[4] Ortiz appeals as of right pursuant to CPLR 5601 (b) (1).

III.

In *Johnson*, respondents argue that the appeal is moot. Respondents note that Johnson was released on parole from Adirondack Correctional Facility and no longer seeks habeas corpus relief. Johnson maintains that the appeal falls within the traditional exception to the mootness doctrine allowing courts "to consider substantial and novel issues that are likely to be repeated and will typically evade review" (*Matter of Gonzalez v Annucci*, 32 NY3d 461, 470 [2018], citing *Matter of Hearst Corp. v Clyne*, 50 NY2d 707, 714-715 [1980]). The parties do not dispute the significance of the issues presented or their likelihood of repetition, but they differ on whether the issues typically evade review. On this question, we agree with Johnson that the issues presented in his appeal "typically will evade our review" (*People ex rel. McManus v Horn*, 18 NY3d 660, 664 [2012]).

---

[4] Ortiz appealed from Supreme Court's judgment directly to this Court, and we transferred the appeal *sua sponte* to the Appellate Division (32 NY3d 1073 [2018], citing NY Const, art VI, §§ 3 [b] [2], 5 [b]; CPLR 5601 [b] [2]).

Because Johnson no longer seeks release from Adirondack Correctional Facility, habeas does not lie, and we convert Johnson's habeas corpus proceeding to a declaratory judgment action (*see People ex rel. Delia v Munsey*, 26 NY3d 124, 134 [2015]; *McManus*, 18 NY3d at 664 n 2).

Similarly, petitioner Ortiz has been released and is no longer entitled to habeas relief. Ortiz's release occurred prior to the Appellate Division's decision, yet that Court declined to dismiss, holding that the matters raised by Ortiz's appeal "are important issues that are likely to arise in other cases but also likely to evade review" (183 AD3d at 579). We agree that these issues should be reviewed (*see generally Gonzalez*, 32 NY3d at 470-471). As in *Johnson*, we convert the habeas proceeding in *Ortiz* to a declaratory judgment action.

IV.

The provision of SARA that underlies the appeals before us, Executive Law § 259-c (14), was enacted in 2000, with significant amendments in 2005 (*see* L 2000, ch 1, § 8, as amended by L 2005, ch 544, § 2). The statute applies to any defendant who is serving a sentence for various enumerated sex offenses, when the victim of the offense was under the age of 18 at the time of the offense or, as in these appeals, the defendant has been designated a level three sex offender.[5] Executive Law § 259-c (14) provides that, when such a sex offender "is released on parole or conditionally released pursuant to subdivision one or two of this section," DOCCS must "require, as a mandatory condition of such

_____

[5] See *Negron*, — NY3d — (decided today).

release, that such sentenced offender shall refrain from knowingly entering into or upon

any school grounds, as that term is defined in subdivision fourteen of section 220.00 of the

penal law."[6]

As amended in 2005, Executive Law § 259-c (14) adopts the broad definition of

"school grounds" set forth in the Penal Law. The term means "any area accessible to the

public located within one thousand feet of the real property boundary line comprising any

such school or any parked . . . vehicle located within one thousand feet of the real property

boundary line comprising any such school" (Penal Law § 220.00 [14] [b]). Consequently,

Section 259-c (14) has been interpreted to prohibit a person subject to the law from living

within 1,000 feet of a school. "The practical effect is that any sex offender who is subject

to the school grounds mandatory condition is unable to reside within 1,000 feet of a school

or facility as defined in Penal Law § 220.00 (14) (b)" (*Diack*, 24 NY3d at 682).

New York statutes allow DOCCS to place a SARA-restricted sex offender

temporarily in an RTF, until SARA-compliant housing is identified (*see People ex rel.*

*McCurdy v Warden* , — NY3d — [2020] [decided today]). We must now decide whether

_____

[6] In his habeas corpus petition, Ortiz contended that Executive Law § 259-c (14), by its
terms, does not apply to a sex offender who is serving PRS after fully serving their
determinate sentence (*see also* Brief of Amici Center for Appellate Litigation, Appellate
Advocates, and Chief Defenders Association of New York in *People ex rel. McCurdy v
Warden*, — NY3d — [2020] [decided today]; Penal Law § 70.40 [2] [defining
conditional release]). However, Ortiz is not pursuing that argument on appeal to this
Court. Consequently, the issue is not before us.

the Federal Constitution allows DOCCS to place a SARA-restricted sex offender in an RTF or other correctional facility, while awaiting SARA-compliant housing.[7]

The principal issue with respect to the substantive due process claims is whether we should apply strict scrutiny or the rational basis test.

Under the Fourteenth Amendment to the United States Constitution, a state government may not deprive an individual "of life, liberty, or property, without due process of law." The Supreme Court has interpreted the guarantee of "due process of law" in the Fifth and Fourteenth Amendments to include "a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them" (*Zinermon v Burch*, 494 US 113, 125 [1990] [internal quotation marks and citations omitted]). Incarceration undoubtedly invokes substantive due process rights. "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action" (*Foucha v Louisiana*, 504 US 71, 80 [1992]), and "commitment for any purpose constitutes a significant deprivation of

---

[7] Johnson and Ortiz mention in passing that we may consider New York's increased constitutional due process protections under the State Constitution. New York courts "have not hesitated[,] when [they] concluded that the Federal Constitution as interpreted by the Supreme Court fell short of adequate protection for our citizens[,] to rely upon the principle that that document defines the minimum level of individual rights and leaves the States free to provide greater rights for its citizens through its Constitution, statutes or rule-making authority" (*Cooper v Morin*, 49 NY2d 69, 79 [1979]). However, Johnson and Ortiz do not contend that it is necessary to develop a state constitutional jurisprudence in this area in the absence of a fitting federal jurisprudence. In other words, they do not argue that we should use a different analytical framework from the Supreme Court in considering the constitutional claims they allege or articulate why state constitutional guarantees were violated if federal constitutional guarantees were not. Accordingly, we apply federal law.

liberty that requires due process protection" (*id.*). A deprivation of liberty occurs, and the protections of the Fourteenth Amendment's Due Process Clause are triggered, by "the State's affirmative act of restraining [an] individual's freedom to act on his own behalf— through incarceration, institutionalization, or other similar restraint of personal liberty" (*Deshaney v Winnebago County Dept. of Social Servs.*, 489 US 189, 200 [1989]). Moreover, inmates possess a fundamental right to "freedom from restraint . . . exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force" (*Sandin v Conner*, 515 US 472, 484 [1995]).

The Federal Constitution does not, however, afford all substantive due process interests the same degree of protection. Substantive due process "provides heightened protection against government interference with certain fundamental rights and liberty interests" (*Washington v Glucksberg*, 521 US 702, 720 [1997]), namely those rights and interests that are "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed" (*Glucksberg*, 521 US at 720-721 [internal quotation marks and citations omitted]). The state may not infringe such a "fundamental" liberty interest "unless the infringement is narrowly tailored to serve a compelling state interest" (*Reno v Flores*, 507 US 292, 301-302 [1993]; *see also Glucksberg*, 521 US at 721). Yet it is well established that not every intrusion on an individual's liberty constitutes a violation of a fundamental right (*see e.g. People v Knox*, 12 NY3d 60, 67 [2009], citing *Immediato v Rye Neck School Dist.*, 73 F3d 454, 463 [2d Cir 1996]). If "no fundamental right is infringed legislation [or other government action] is valid if it is rationally related to legitimate government

interests" (*Knox*, 12 NY3d at 67, citing *Glucksberg*, 521 US at 728, and *Hope v Perales*, 83 NY2d 563, 577 [1994]).

Johnson's interest in being released to parole, after his open parole date had been announced, did not constitute a fundamental liberty interest. "There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence. . . . [T]he conviction, with all its procedural safeguards, has extinguished that liberty right: Given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty" (*Greenholtz v Inmates of Nebraska Penal & Corr. Complex*, 442 US 1, 7 [1979] [internal quotation marks, citations, and alterations omitted]). In other words, "[t]he Supreme Court has held . . . that because a person's rightful liberty interest is extinguished upon conviction, there is no inherent constitutional right to parole" (*Russo v NY State Bd. of Parole*, 50 NY2d 69, 73 [1980]).

It is true that in addition to those liberty interests that "arise from the Constitution itself," a liberty interest "may arise from an expectation or interest created by state laws or policies" (*Wilkinson v Austin*, 545 US 209, 221 [2005]; *see also Sandin*, 515 US at 483-484 ["States may under certain circumstances create liberty interests . . . protected by the Due Process Clause"]). As this Court has recognized, "when a State adopts a sentencing scheme which creates a legitimate expectation of early release from prison, there then exists a liberty interest deserving of constitutional protection" (*Russo*, 50 NY2d at 73-74). Rather than a fundamental right, such a liberty interest "is grounded in New York's regulatory scheme" (*Victory v Pataki*, 814 F3d 47, 60 [2d Cir 2016]) and is a restricted form of liberty, not subject to strict scrutiny.

It is also true that the Constitution affords a confined individual both substantive and procedural due process protection (*see Deshaney*, 489 US at 201 n 8 ["Of course, the protections of the Due Process Clause, both substantive and procedural, may be triggered when the State . . . subjects an involuntarily confined individual to deprivations of liberty which are not among those generally authorized by his confinement"]; *see generally Mark G. v Sabol*, 93 NY2d 710, 722-726 [1999]). A petitioner may simultaneously assert liberty interests based on procedural and substantive due process protection. To the extent that the constitutional liberty interest resulting from a state-created "legitimate expectation of early release" (*Russo*, 50 NY2d at 73) exists in the form of *procedural* due process protections (*see id.* at 76 n 5), courts will review only "the application of those constitutionally required *procedures*" (*Swarthout v Cooke*, 562 US 216, 220 [2011] [emphasis added]). Here, however, Johnson has not preserved any claim that his continued incarceration failed to comply with standards of procedural due process.

The applicable standard of review of Johnson's due process claim is, then, the rational basis test, not strict scrutiny.[8]

Ortiz's appeal introduces a closer question because his case does not involve a claimed right to parole release. Ortiz asserts that his confinement to an RTF in prison-like conditions, after the maximum expiration date of his determinate sentence had passed,

---

[8] Johnson alternatively contends that the standard is intermediate scrutiny. We applied the intermediate standard in analyzing substantive due process rights in *Anonymous v City of Rochester* (13 NY3d 35 [2009]), but that involved a constitutionally unique situation involving conflicting claims of minors to enjoy freedom of movement and of parents to control the upbringing of the children. No such unique "complexities" (*id.* at 47, 48) favor Johnson.

violated his fundamental liberty interest. However, like Johnson, Ortiz was subject to the SARA residency requirement[9] and therefore his assignment to an RTF was based on a mandatory condition of his PRS—a condition that DOCCS can require him to satisfy while he is under its supervision (*see generally People v Catu*, 4 NY3d 242, 245 [2005]). Moreover, to treat Ortiz's claimed right to release as a fundamental constitutional liberty interest would be self-defeating. The law unquestionably provides that a defendant sentenced to PRS who violates "any condition of supervision . . . at any time during [PRS]" may be reincarcerated (Penal Law § 70.45 [1]). Indeed, "a defendant serving a term of [PRS] for a conviction of a felony sex offense [as defined in the statute]. . . may be subject to a further period of imprisonment up to the balance of the remaining period of [PRS]" (*id.*). Requiring an individual who has not satisfied SARA's housing restrictions to remain in an RTF until SARA-compliant housing is identified does not violate a fundamental liberty interest.

Ortiz relies on decisions that have applied strict scrutiny to review post-incarceration supervision of sex offenders, particularly *United States v Myers* (426 F3d 117 [2d Cir 2005]), where the United States Court of Appeals for the Second Circuit considered a special condition of supervised release, imposed under federal law, prohibiting the defendant "from spending time alone with his child absent authorization from the U.S. Probation Office" (*id.* at 120). The Second Circuit held that, to satisfy substantive due

---

[9] As noted above, Ortiz does not dispute that he is subject to Executive Law § 259-c (14) and, thus, that the residency requirement is "a mandatory condition of" release to PRS (Executive Law § 259-c [14]).

process, such a restriction on a releasee's liberty "must reflect the heightened constitutional concerns" of strict scrutiny (*id.* at 126).  However, the *Myers* opinion leaves no doubt that the reason the Second Circuit imposed strict scrutiny was that the interest of parents in "the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court (*id.* at 125, quoting *Troxel v Granville*, 530 US 57, 65-66 [2000] [plurality opinion of O'Connor, J.]), not that this is the general standard for assessing statutory restrictions imposed on sex offenders who have completed their prison sentences.

Ortiz also cites *Francis v Fiacco* (942 F3d 126 [2d Cir 2019]), in which the Second Circuit observed that a defendant's "interest in freedom from detention [i]s an interest of the highest order" (*id.* at 143).  Notably, however, the *Francis* Court engaged in a procedural due process analysis, applying *Mathews v Eldridge* (424 US 319, 335 [1976]).[10] It did not apply strict scrutiny or describe the due process rights as "substantive" or "fundamental."

We do not believe that Ortiz's claimed right to be free from continued confinement in the RTF, or to treat the RTF as he would a shelter from which he could depart at his convenience during daylight hours, amounts to a fundamental, deeply rooted due process right.  It is equivalent either to a claimed right to be free of PRS conditions or to an alleged right that his PRS conditions may not be equivalent to an extended incarceratory sentence. Neither is a fundamental due process right.

---

[10] We agree with the Appellate Division that Ortiz has not preserved a procedural due process claim (*see* 183 AD3d at 581).

Ortiz's substantive due process claim must therefore be understood as asserting non-fundamental constitutional rights and, as with Johnson's, it is subject to rational basis review, not strict scrutiny.[11]

V.

Our holding as to the standard of review is a significant one because Johnson and Ortiz argue that SARA's residency restrictions serve no vital purpose, so that the challenged confinements cannot be necessary for the achievement of a compelling government purpose and would not pass strict scrutiny review.   It is true that the effectiveness of SARA's residence restrictions has been questioned (*see Report of the Advisory Committee on Criminal Law and Procedure to the Chief Administrative Judge of the Courts of the State of New York* [2017] at 29-34).[12]  However, we have no occasion to evaluate these policy claims.  As we have held, the standard of review in these appeals is the rational basis test.  Therefore, the challenged confinements must be evaluated by means

---

[11] Ortiz has not preserved any contention tying his family relationships to the application of an intermediate scrutiny standard, such as the argument explored in Judge Rivera's dissent (*see* Rivera, J., dissenting op at 20-24).

[12] Research from the United States Department of Justice, cited by the petitioners, indicates that about 93% of all sex crimes with juvenile victims are perpetrated by offenders who are known to the victim prior to the offense (*see* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Sexual Assault of Young Children as Reported to Law Enforcement: Victim, Incident, and Offender Characteristics, at 10 [2000] [34% were committed by family members and 59% by acquaintances]).  By contrast, as petitioners see it, SARA is directed at preventing sex crimes against schoolchildren by strangers.  Johnson asserts, and respondents do not deny, that during a period from 2005 through 2014, when DOCCS was treating all NYCDHS shelters as SARA-compliant, no sex offense was reported involving a child who was on or near school grounds in which the perpetrator was a stranger living in a homeless shelter less than 1,000 feet from a school.

of "the most relaxed and tolerant form of judicial scrutiny" (*Myers v Schneiderman*, 30 NY3d 1, 15 [2017], quoting *Dallas v Stanglin*, 490 US 19, 26 [1989]), and the confinements are justifiable if "rationally related to any conceivable legitimate State purpose" (*Myers*, 30 NY3d at 15, quoting *People v Walker*, 81 NY2d 661, 668 [1993]). "Indeed, courts may even hypothesize the Legislature's motivation or possible legitimate purpose. At bottom, the rational basis standard of review is a paradigm of judicial restraint." (*Myers*, 30 NY3d at 15-16 [internal quotation marks, citations, and alterations omitted]; *see Affronti v Crosson*, 95 NY2d 713, 719 [2001]; *Heller v Doe*, 509 US 312, 320 [1993].)

Applying this undemanding level of judicial review, the temporary confinement of sex offenders in correctional facilities, while on a waiting list for SARA-compliant NYCDHS housing, is rationally related to a conceivable, legitimate government purpose of keeping level three sex offenders more than 1,000 feet away from schools. First, under the rational basis test, we do not evaluate whether the government purpose is a vital or compelling one. Moreover, the challenged detentions were rationally related to the purpose of SARA in that they ensured that petitioners—who, as level three sex offenders, are considered to pose a high risk of recidivism—had no contact with minors while awaiting confirmation of appropriate residence. The existence of less restrictive methods of monitoring petitioners during this period does not invalidate the use of correctional facilities. Confining level three sex offenders who are on a waiting list for SARA-compliant shelter housing is not " 'so unrelated to the achievement of any combination of

legitimate purposes' as to be irrational" (*Knox*, 12 NY3d at 69, quoting *Affronti*, 95 NY2d at 719).

VI.

Ortiz has preserved a separate constitutional claim, based on the constitutional prohibition against "cruel and unusual punishments" in the Eighth Amendment.  We conclude that this argument too lacks merit.

"The Cruel and Unusual Punishments Clause circumscribes the criminal process in three ways: First, it limits the kinds of punishment that can be imposed on those convicted of crimes; second, it proscribes punishment grossly disproportionate to the severity of the crime; and third, it imposes substantive limits on what can be made criminal and punished as such" (*Ingraham v Wright*, 430 US 651, 667 [1977] [citations omitted]).

Ortiz focuses on the third element and contends initially that his confinement in an RTF, after the maximum expiration date of his determinate sentence had passed, constituted a cruel and unusual punishment, because it amounted to punishment based on a condition or status that "may be contracted innocently or involuntarily" (*Robinson v California*, 370 US 660, 667 [1962]).  In general, punishments imposed on persons for their status, rather than their conduct, are invalid under the Eighth Amendment.  In *Robinson*, the Supreme Court invalidated a California statute making it a criminal offense for a person to "be addicted to the use of narcotics," regardless of whether the person had used narcotics in California.  The law at issue was not one that punished a defendant "for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior resulting from their administration" (*Robinson*, 370 US at 666); it purported to punish

addiction itself. The Supreme Court, noting that a law that "made a criminal offense of . . . a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment" (*id.*), held the California statute to violate the Eighth Amendment.

In addition to *Robinson*, Ortiz cites a recent decision of the United States Court of Appeals for the Ninth Circuit, *Martin v City of Boise* (920 F3d 584 [9th Cir 2019]), in which that court held that an ordinance imposing criminal sanctions against homeless people, for sleeping outdoors, on public property, when no alternative shelter is available to them, violates the constitutional prohibition on cruel and unusual punishments. The Ninth Circuit explained "that the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being" (*Martin*, 920 F3d at 616; *see generally Powell v Texas*, 392 US 514 [1968] [a chronic alcoholic found guilty of intoxication in a public place is properly punished for the act of becoming intoxicated, not the status of being an alcoholic]).

Ortiz contends that he was similarly punished for an unavoidable consequence of his indigent status, namely that he cannot find a SARA-compliant residence in New York City. In short, Ortiz maintains he was punished for being homeless. Assuming, without deciding, that *Martin*'s test is proper, we conclude that Ortiz's confinement in an RTF did not constitute punishment for a "universal and unavoidable consequence[]" (*Martin*, 920 F3d at 617) of his status as an indigent level three sex offender. Instead, it reflects a broader set of social circumstances in which sex offender and society alike prefer that the offender remain in his city of long-time prior residence, especially if he must rely on local social services departments for shelter housing, and not relocate simply because SARA-

compliant housing is plentiful elsewhere. Put simply, Ortiz's confinement in an RTF did not constitute status punishment.

Ortiz also argues that his confinement amounted to a cruel and unusual punishment on the ground that his detention beyond the maximum expiration date was the result of deliberate indifference to his liberty interest (*see generally Estelle v Gamble*, 429 US 97, 104-06 [1976] [deliberate indifference to prisoners' medical needs is proscribed by the Eighth Amendment]). Ortiz asserts that DOCCS did nothing to investigate housing options for him until his maximum expiration date approached. He repeatedly suggests that DOCCS should have simply released him to the NYCDHS shelter system, i.e., should have relied on NYCDHS's obligation, under the 1981 *Callahan* consent decree, to take in any homeless persons applying for shelter (*see generally Callahan v Carey*, 12 NY3d 496 [2009]).

For the purpose of this appeal, in which the larger record of cooperation between DOCCS and NYCDHS is not before us, we need only decide whether DOCCS's conduct with respect to Ortiz constituted deliberate indifference as a matter of law.[13] It did not. As

---

[13] Respondents in *People ex rel. Ortiz v Breslin* move to strike Ortiz's compendium, which incorporates certain extrajudicial documents, as well as petitioner's brief, which relies in part on those documents. Respondents in *People ex rel. Johnson v Superintendent* move to strike the addendum to Johnson's reply brief, which again incorporates extrajudicial material, and to strike the parts of the reply brief that rely on that addendum. Petitioners cite the material to argue, among other things, that if respondents had simply released them and deposited them at NYCDHS shelter intake in New York City, NYCDHS would have placed them in SARA-compliant shelters.

Today, we grant respondents' motions insofar as they seek to strike extrajudicial record material and those portions of the briefs relying on that extrajudicial information. It is "well settled . . . that the factual data on which a claim of unconstitutionality is based is to be presented as evidence to the trial court not as addenda to the briefs submitted in

we observed in *Gonzalez v Annucci*, a sex offender cannot simply "be released to any homeless shelter in New York City." For one thing, the legislature has "imposed a duty on the parole officer to actually supervise the parolee, which requires knowledge. . . that [the parolee's residence] is not in violation of the conditions of release" (*Gonzalez*, 32 NY3d at 473, n 5). Ortiz offers no evidence that DOCCS ever precluded him from accessing a SARA-compliant shelter bed that NYCDHS was willing to make available. Indeed, Ortiz does not dispute that DOCCS released Ortiz to a SARA-compliant shelter as soon as one became available for him.

DOCCS's use of RTFs reflects the extreme difficulties in finding affordable New York City housing that is not within 1,000 feet of a school. New York City's SARA-compliant shelters have a vacancy rate of 0.4%, indicative of the high demand for shelter housing in New York City generally, as well as the considerable number of SARA-subject sex offenders seeking such housing. The challenges faced by DOCCS, when "presented by inmates convicted of sex offenses who must obtain SARA-compliant housing and must do so in a very limited market without financial resources" (*Gonzalez*, 32 NY3d at 472), are substantial. DOCCS's confinement of Ortiz in an RTF, consistent with statutory

---

this court," and that "[w]hile judicial notice may be taken of some official documents by appellate courts, it is simply improper to make wholesale presentation of factual data through the medium of addenda to a brief" (*Board of Educ. of Belmont Cent. School Dist. v Gootnick*, 49 NY2d 683, 687 [1980]). Moreover, we agree with respondents that it would be improper to resolve questions about NYCDHS's policies and procedures regarding SARA-restricted sex offenders in cases in which NYCDHS is not a party and the existing record contains no evidence resolving those questions.

        The dissenters' theory that DOCCS and NYCDHS have conspired to defeat the *Callahan* consent decree was not raised by any party and is not borne out by the factual record before this Court.

authorization, did not constitute deliberate indifference to his plight as a sex offender who is subject to SARA.

## VII.

Finally, Ortiz raises a statutory argument based on the description of RTFs in the pertinent statutes as "residence[s] for persons who are on community supervision" (Correction Law § 73 [10]). Ortiz's argument is essentially that the legislature, by choosing the word "residence," intended RTFs to be shelter-like, rather than prison-like, correctional facilities, from which residents would be free to depart daily, without supervision, in order to take advantage of local community opportunities for training or employment.

Supporting Ortiz's interpretation is the fact that an RTF is statutorily defined as "[a] correctional facility consisting of a *community based residence* in or near a community where employment, educational and training opportunities are readily available for persons who are on parole or conditional release . . ." (Correction Law § 2 [6] [emphasis added]). However, we disagree with Ortiz's claims that Correction Law § 73 (10) is a *sui generis* subsection that "cannot be read in conjunction with the other subsections of" Correction Law § 73 and that the legislature intended to convey by means of the single word "residence" that RTFs should be home-like institutions. The legislature did not incorporate such assumptions expressly into the statute, instead allowing DOCCS leeway to design its RTF programs and facilities.

Finally, Queensboro Correctional Facility is itself in close proximity to schools, as Ortiz concedes. As a practical matter, it would have defeated SARA's purposes to let Ortiz "come and go" as he pleased from the RTF in which he was placed.

We have considered petitioners' remaining contentions and we conclude that they too lack merit. The appeals before us present troubling issues concerning the fairness and effectiveness of the methods chosen by the legislature for deterring sex offender recidivism. These are important public policy issues that may require legislative attention.

Accordingly, in each appeal, the order of the Appellate Division should be modified, without costs, by converting the proceeding into a declaratory judgment action and granting judgment in accordance with this opinion and, as so modified, affirmed.

RIVERA, J. (dissenting):

These appeals concern constitutional challenges to the potentially indefinite confinement of level three sex offenders—regardless of the fact that they have been granted parole or have completed their terms of imprisonment and are serving the *postrelease*

- 1 -

supervision (PRS) portion of their sentences—solely because they are unable to afford housing more than 1,000 feet away from school property and because the Department of Corrections and Community Supervision (DOCCS) refuses them the opportunity to exercise their right to request placement in a New York City homeless shelter. The resolution of these claims turns on the correct classification of the challenged State action and the appropriate level of constitutional scrutiny.

The State has allowed this indefinite incarceration solely to reduce the administrative burden on New York City's homeless shelter system. Because that policy does not serve a correctional purpose, the State's interest is at its lowest ebb. On the other side of the scale, the liberty interests at issue derive from a constellation of State and City statutory and regulatory schemes intended to foster reentry into the community and prevent recidivism and, in certain cases, implicate indisputably fundamental rights. Therefore, heightened intermediate judicial review applies and, under the circumstances here, DOCCS' actions plainly fail that standard. Even assuming, as the majority does, that DOCCS' policy is subject only to rational basis review, we must still consider whether the policy serves a legitimate purpose. It is far from clear that DOCCS' chosen course of action meets that relatively relaxed standard. Therefore, I would declare DOCCS' policy unconstitutional as applied.[1]

---

[1] Although petitioners have been released, I agree with the majority that the mootness exception applies and the proper course is to convert these habeas corpus proceedings to declaratory judgment actions (majority op at 6-7).

I.

FACTUAL AND PROCEDURAL BACKGROUND

A. Fred Johnson

Petitioner Fred Johnson was serving an indeterminate term of two years to life following his conviction of persistent sexual abuse. After more than eight years of incarceration, the New York State Board or Parole granted Johnson an open parole date. In so doing, the Board necessarily found that there was a reasonable probability that he would "live and remain at liberty without violating the law" and that his release would not be "incompatible with the welfare of society" (Executive Law § 259-i [2] [c]). As a level three sex offender serving a sentence for an enumerated offense, Johnson was subject to the restriction mandated by Executive Law § 259-c (14) (SARA), which prohibits him from entering within 1,000 feet of school property.

DOCCS rejected Johnson's proposal that he reside with his twin brother in South Carolina. Johnson is indigent and was thus unable to identify alternative affordable housing that complied with SARA in New York City, the community in which he lived before his incarceration. Therefore, he requested to seek shelter through New York City's Department of Homeless Services (DHS). Instead of allowing Johnson to present himself at DHS for shelter placement, as in the case of other homeless New Yorkers, Johnson was placed on a DOCCS waiting list for an available bed in a SARA-compliant shelter in the City. Solely

due to this SARA incarceration policy,[2] Johnson remained in a facility for an additional 27 months after his open parole date while he awaited a space at a shelter.

With no release date in sight, Johnson filed a petition for a writ of habeas corpus. Challenging his incarceration on substantive due process grounds, he argued that DOCCS' application of SARA to keep him in prison violated his fundamental right to be free from confinement. Johnson also argued that because he had never victimized a child, SARA— which is intended to protect children from sex offenders—was irrational as applied to him.

### B. Angel Ortiz

Petitioner Angel Ortiz was sentenced to a determinate term of ten years' incarceration and five years' PRS following his conviction of robbery and attempted sexual abuse. After earning good time credits and serving the majority of his determinate sentence, the State certified Ortiz as ready for release and assigned him a conditional release date. Ortiz, like Johnson, was adjudicated a level three sex offender serving a sentence for an enumerated offense and thus subject to SARA's restriction that he not enter within 1,000 feet of school property. According to the record, Ortiz is amenable to release in upstate locations but repeatedly expressed a strong desire to be released in New York City, where his mother and daughter live. He described his mother as "[his] rock," and explained that

---

[2] DOCCS concedes that it has a policy to deny release to petitioners like Johnson who are indigent and unable to identify SARA-compliant housing and instead holds them in a correctional facility until a residence or shelter bed in the community is available. The State does not argue this is other than incarceration, so I accordingly refer to this as the SARA incarceration policy.

his daughter "was [his] drive in order for [him] to change" following his incarceration. Nonetheless, DOCCS determined he could not live with his mother because her address is not SARA-compliant. Because he is indigent, Ortiz is unable to obtain SARA-compliant housing and so he remained in prison after his conditional release date while waiting for an appropriate New York City shelter bed. Upon the maximum expiration date of the carceral portion of his sentence, DOCCS confined Ortiz in a residential treatment facility (RTF) and prohibited any visits with his daughter. DOCCS ultimately released Ortiz to a SARA-compliant shelter approximately 25 months after his conditional release date and eight months after the end of his determinate prison sentence.

While incarcerated at the RTF, Ortiz filed a petition for a writ of habeas corpus. Like Johnson, Ortiz argued that DOCCS violated his substantive due process rights by confining him during the PRS portion of his sentence in a manner indistinguishable from his imprisonment during his determinate sentence. Ortiz also argued that his potentially indefinite confinement constituted cruel and unusual punishment in violation of the Eighth Amendment, imposed on him solely because he is indigent and therefore reliant on the DHS shelter system. He also argued that he should at least be treated as a resident while held in the RTF, with the entry and exit privileges that would be available to him were he living in the community.

II.

CONSTITUTIONAL QUESTION PRESENTED

Petitioners mount an as-applied constitutional challenge, arguing that they have a fundamental right to be free from State confinement after their respective release dates and

that DOCCS violates that right by confining them solely because they are indigent and unable to afford SARA-compliant housing in their New York City communities. According to petitioners, DOCCS' policy cannot survive strict scrutiny, the highest and most demanding standard of review, because they may be released for initial placement in a DHS homeless shelter until they can find affordable SARA-compliant housing. Alternatively, petitioners argued the policy fails even intermediate scrutiny.

The State responds that petitioners have no fundamental right to conditional release, which is neither a constitutional right nor grounded in the nation's history. Therefore, petitioners' continued incarceration is lawful because DOCCS has a rational basis for confining them pending the availability of a SARA-compliant residence, including a shelter bed in New York City.

The petitioners are correct to the extent that, generally, the right to be free from State confinement is fundamental and constitutionally protected against unlawful deprivation (*see DeShaney v Winnebago*, 489 US 189, 200 [1989] ["[I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf . . . which is the 'deprivation of liberty' triggering the protections of the Due Process Clause"]). However, petitioners' liberty interests were extinguished during the period of their lawfully imposed prison sentences (*see Greenholtz v Inmates of Nebraska Penal & Corr. Complex*, 442 US 1, 7 [1979] ["[T]he conviction, with all its procedural safeguards, has extinguished that liberty right: Given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty"] [internal alterations and citations omitted]; *but see McNeil v Dir., Patuxent Inst.*, 407 US 245, 246 [1972] [agreeing that "when [an inmate's] sentence expired, the

State lost its power to hold him, and that his continued detention violates his rights under the Fourteenth Amendment"]; *Calhoun v New York State Div. of Parole Officers*, 999 F2d 647, 653 [2d Cir 1993] ["Under both the due-process clause and state law, an inmate has a liberty interest in being released upon the expiration of his maximum term of imprisonment."]). Additionally, petitioners' sole support for their argument that they possess a fundamental right to be released from confinement is derived from case law addressing the metes and bounds of *procedural* due process, rather than the jurisprudence governing substantive rights under the Due Process Clause (*see* majority op 11). Petitioners make no claim that during their SARA-confinement they have been deprived of procedural safeguards against unlawful State action.

For the majority, this ends the inquiry—not just as to the proper standard of review but, more importantly, as to the nature of the asserted right as well. The majority's equation is simple: Because no fundamental right is implicated by the State's confinement of Johnson beyond his open parole date or of Ortiz beyond his maximum incarceration date, the State need only articulate a rational basis for their continued incarceration, a requirement easily met here. But that conclusion turns rational basis *review* into a perfunctory rubber stamp—rendering outcome determinative the choice of standard rather than its application. Rational basis requires that the State action be logical, reasonable, and sensible, even if only minimally so. Put another way, the State cannot take action that is groundless, counterfactual, or unjust.

Moreover, the majority's analysis disregards this Court's long history of applying heightened constitutional scrutiny under circumstances like the ones presented in these

appeals, where the Court is called upon to balance meaningful individual rights (which themselves implicate fundamental rights) against a State policy that contravenes the free exercise of those rights. More so here, where the individual interests align with legislation enacted to achieve the salutary goals of reentry and reduced recidivism.

Indeed, the majority acknowledges that our case law recognizes a liberty interest in New York's regulatory scheme which by design creates "a legitimate expectation of early release from prison" (majority op at 11). The majority rejects in a footnote, however, petitioners' claims that these rights subject DOCCS' policy to at least intermediate review, because, according to the majority, the issue is insufficiently complex to warrant more than de minimis scrutiny (*id.* at 12 n 8).[3] This misreads our case law, which applies intermediate scrutiny when there is a need to "provide rigorous protection of constitutional rights" while also "accommodat[ing]" the State's need to craft legislation to effectuate its legitimate interests (*Anonymous v Rochester*, 13 NY3d 35, 47 [2009]).

That standard is appropriate here, where the State has enacted a statutory and regulatory scheme intended to reduce recidivism and to promote public safety by assisting the formerly incarcerated with their reentry into society, including those released subject to conditions. Those same State provisions are balanced against DOCCS' SARA-

---

[3] The majority's conclusion that petitioners do not advocate for an approach different from the Federal Constitution is puzzling. Petitioners maintain that the policy violates their State due process rights and cite to cases in support of that assertion. That is all they need do for this Court to consider whether the State Constitution affords protection beyond that recognized under its federal counterpart. In any case, as I discuss (*see* 25, *infra*), federal law recognizes "a liberty interest grounded in New York's regulatory scheme" (*Victory*, 814 F3d at 60).

incarceration policy. Thus, the question before us is whether this interconnected statutory and regulatory scheme is hindered by DOCCS, making its policy an irrational choice to achieve the legislature's reentry goals.

Given record evidence that SARA's 1,000-foot school property rule fails to achieve the legislature's express purpose in enacting it, DOCCS' decision to confine these petitioners may not be rational, but it most certainly cannot survive intermediate scrutiny.

III.

STATE STATUTORY AND REGULATORY SCHEME

The interplay between the various laws and regulations in New York that govern conditional release of the formerly incarcerated endow petitioners' asserted liberty interests—and the interests of those similarly situated—with a measure of constitutional significance warranting the application of heightened scrutiny.

For example, Johnson was granted an open parole date pursuant to a complex statutory and regulatory scheme, all intended to further the successful reentry of an individual deemed ready to return to the community. First, the Penal Law provides that "[r]elease on parole shall be in the discretion of the state board of parole, and such person shall continue service of [their] sentence or sentences while on parole, in accordance with and subject to the provisions of the executive law and the correction law" (PL § 70.40 [a]). The Executive Law, in turn, provides that,

> "at least one month prior to the date on which an inmate may
> be paroled pursuant to subdivision one of section 70.40 of the
> penal law, a member or members as determined by the rules of

> the board shall personally interview such inmate and determine whether [they] should be paroled in accordance with the guidelines adopted pursuant to [§ 259-c (4)]" (Exec. Law § 259-i [2] [a]; *see also* Exec. Law § 259-c [directing the Board to develop written procedures for making parole decisions that "incorporate risk and needs principles to measure the rehabilitation of persons appearing before the board, the likelihood of success of such persons upon releasee, and assist . . . in determining which inmates may be released to parole supervision"]).

Additionally, the Executive Law governs the specific criteria which the Board may consider when granting or denying parole:

> "Discretionary release on parole shall not be granted merely as a reward for good conduct or efficient performance of duties while confined but after considering if there is a reasonable probability that, if such inmate is released, [they] will live and remain at liberty without violating the law, and that [their] release is not incompatible with the welfare of society and will not so deprecate the seriousness of [their] crime as to undermine respect for law" (Exec. Law § 259-i [2] [c] [A]; *see also id.* [elaborating on the list of factors the Board may consider including, among others, work and educational history while incarcerated, interaction with prison staff and inmates, and release plans]).

In other words, parole is to be granted only after the Board has determined that the individual will "live and remain at liberty without violating the law" and that their release will not put at risk the wellbeing of the community.

As for Ortiz, he first sought to be conditionally released after he accumulated a time allowance for good behavior, to be credited against the remaining portion of his sentence, pursuant to Correction Law § 803. That provision states:

> "Every person confined in an institution of the department or a facility in the department of mental hygiene serving an indeterminate or determinate sentence of imprisonment, except

a person serving a sentence with a maximum term of life imprisonment, may receive time allowance against the term or maximum term of [their] sentence imposed by the court. Such allowances may be granted for good behavior and efficient and willing performance of duties assigned or progress and achievement in an assigned treatment program, and may be withheld, forfeited or canceled in whole or in part for bad behavior, violation of institutional rules or failure to perform properly in the duties or program assigned" (CL § 803 [1] [a]).

When Ortiz's accrued good behavior time allowances equaled the amount of time remaining on the carceral portion of his sentence, he was *entitled* to conditional release under Penal Law § 70.40:

"A person who is serving one or more than one indeterminate or determinate sentence of imprisonment *shall, if [they] so request[], be conditionally released* from the institution in which [they are] confined when the total good behavior time allowed to [them], pursuant to the provisions of the correction law, is equal to the unserved portion of [their] term, maximum term or aggregate maximum term . . . ." (PL § 70.40 [1] [b] [emphasis added]).

Once Ortiz reached the end of the carceral portion of his sentence, he commenced serving the PRS portion. PRS is governed by Penal Law § 70.40, which provides:

"When a court imposes a determinate sentence it shall in each case state not only the term of imprisonment, but also an additional period of post-release supervision as determined pursuant to this article. Such period shall commence as provided in subdivision five of this section and a violation of any condition of supervision occurring at any time during such period of post-release supervision shall subject the defendant to a further period of imprisonment up to the balance of the remaining period of post-release supervision, not to exceed five years" (PL 70.45 [1]).

The purpose of PRS is, generally, to provide for the monitoring of certain individuals upon their reintroduction to society (*see People v Sparber*, 10 NY3d 457, 469 [2008]), and to

assure that that reintroduction is successful (*see* Donnino, Practice Commentary, McKinney's Cons. Laws of NY, Book 39, Penal Law § 70.45, at 396 [2004 ed]).

Moreover, New York State and City have enacted policies that evince a legislative goal of ensuring the successful transition from incarceration into the community. For instance, New York State prohibits discrimination in hiring and professional licensing solely on account of an individual's criminal conviction (*see e.g.* Correction Law § 752 ["No application for any license or employment . . . shall be denied . . . by reason of the individual's having been previously convicted . . ."]; Executive Law § 296 [15], [16]; *see also Dempsey v New York City Dept. of Educ.*, 25 NY3d 291, 298 [2015] ["Article 23–A of the Correction Law protects persons who seek employment, after having been convicted of one or more criminal offenses, from unfair discrimination . . ."]; *Gonzalez v Annucci*, 32 NY3d 461, 480 [Wilson, J., dissenting] ["In all respects, the statutory scheme is one that seeks systematically to remove from the willing inmate the disabilities of past crimes and imprisonment"]). New York City's "Fair Chance Act" similarly demonstrates the City's goal of ensuring the successful integration of formerly incarcerated persons into the community (*see* Fair Chance Act, NYC Local Law No. 63 (2015); *see also* NYC Commn. on Human Rights, Legal Enforcement Guidance on the Fair Chance Act, Local Law No. 63 [2015] ["The (Fair Chance Act) reflects the City's view that job seekers must be judged on their merits before their mistakes . . . (and) is intended to level the playing field . . . (for) New Yorkers who are part of the approximately 70 million adults residing in the United States who have been arrested or convicted of a crime"]).

Affordable housing is critical to reintegration, as it promotes stability and a sense of community that encourages law-abiding behavior (*see* New York State Council on Community Re-entry and Reintegration, The Reentry Council, https://www.governor.ny.gov/criminal-justice-reform/new-york-state-council-community-re-entry-and-reintegration [last accessed Nov. 4, 2020] ["Individuals with criminal convictions continue to face significant economic and social barriers to their successful reintegration into society. On average, New York State releases more than 25,000 people from prison each year and research shows that without successful re-entry policies, there is a higher rate of re-convictions"]; *see also* 18 NYCRR § 352.36 [a] [3] [describing "the importance of stable housing and support in allowing offenders to live in and re-enter the community and become law-abiding and productive citizens"]).

Significantly, New York City has recognized that indigent individuals, like Johnson and Ortiz, have a legally enforceable right to shelter. For nearly four decades, the City has, pursuant to a consent decree, guaranteed that homeless individuals who present themselves for intake at a City shelter will be provided with a bed. The consent decree requires the City to "provide shelter and board to each homeless man who applies for it provided that (a) the man meets the need standard to qualify for the home relief program established in New York State; or (b) the man by reason of physical, mental or social dysfunction is in need of temporary shelter" (*Callahan v Carey*, Final Judgment by Consent at ¶ 1, Index No. 42582/79 [Sup Ct, New York County 1981]; *see also Gonzalez*, 32 NY3d at 489 ["(H)ad DOCCS released (the petitioner) to any homeless shelter in New York City, the City would have been required to find him a bed, because the City guarantees (and indeed

must guarantee) housing for every homeless person who requests it"]). The right has been extended to women and families (*Eldridge v Koch*, 98 AD2d 675 [1st Dept 1983]; *Matter of McCain v Koch*, 117 AD2d 198, 222 [1st Dept 1986], *revd in part*, 70 NY2d 109 [1987]).

The City publicly acknowledges that its approach to homelessness is "[g]overned by a unique mandate" to provide shelter-on-demand "to every man, woman, and child who is eligible for services, every night" (New York City, DHS, *Shelter*, https://www1.nyc.gov/site/dhs/shelter/shelter.page [last accessed Nov. 4, 2020]). The City proudly proclaims that its "policy sets New York part from municipalities across the nation—many of which turn homeless individuals and families away once shelters have filled up or simply put their names on a waiting list" (*id.*). New York City's shelter system is consistently recognized as the most sophisticated and comprehensive in the nation.

As part of "providing shelter as a safety net for those in need" (*id.*), the City has adopted a regulatory framework that governs temporary housing assistance for homeless individuals and families, including assessment and case management, access to healthcare, and assistance with finding permanent housing (*see* 18 NYCRR § 491.14 [requiring that shelter operators "shall be responsible for the development and provision of resident services that shall include, at a minimum, room, board, health services, social rehabilitation services, supervision, and information and referral"]).

Moreover, the State has recognized its affirmative obligation to assist sex offenders in finding housing once released and, critically, that this obligation promotes post-release stability and reduces recidivism (*see* 18 NYCRR § 352.36 [a] [3] ["The State's coordinated and comprehensive approach also recognizes the necessity to provide emergency shelter to

individuals in need, including those who are sex offenders, and the importance of stable housing and support in allowing offenders to live in and re-enter the community and become law-abiding and productive citizens"]; *id.* 352.36 § [b] [describing procedures local social services departments are to follow in providing housing for released level three sex offender]; *see also Gonzalez*, 32 NY3d at 474 [requiring DOCCS "to assist inmates prior to release and under supervision to secure housing"]).

On the other hand, DOCCS' asserted interest is in the enforcement of SARA, which provides:

> "[W]here a person serving a sentence for an [enumerated] offense . . . and the victim of such offense was under the age of eighteen at the time of such offense or such person has been designated a level three sex offender . . . , is released on parole or conditionally released . . . , the board shall require, as a mandatory condition of such release, that such sentenced offender shall refrain from knowingly entering into or upon any school grounds" (Exec. Law § 259-c [14]).

In enacting SARA, the "legislature was clearly concerned with the release of the sex offender back into a community," and "the point" of the legislation was "keeping sex offenders . . . 1,000 feet from children in school areas" (*Gonzalez*, 32 NY3d at 473 n 5; *see also Williams v. DOCCS*, 136 AD3d 147, 154 [1st Dept 2016] ["[T]he legislative intent [of SARA was] to protect children"]). However, SARA's text and purpose fail to evince a legislative intent to continue the incarceration and delay the release of indigent offenders, potentially indefinitely, by preventing them from requesting SARA-compliant shelter at DHS intake.

IV.

STANDARD OF REVIEW

A. Rational Basis

The rational basis test is a lenient one. However, "while rational basis review is indulgent and respectful, it is not meant to be 'toothless' " (*Windsor v United States*, 699 F3d 169, 180 [2d Cir 2012], *affd*, 570 US 744 [2013]; *see also Winston v. City of Syracuse*, 887 F3d 553, 560 [2d Cir 2018] ["Rational basis review, however, does require some scrutiny of . . . government activity"]). Nor can government action survive rational basis review if its justification is "flimsy or implausible" (*U.S. R.R. Ret. Bd. v Fritz*, 449 US 166, 184 [1980]). Instead, the challenged action must "rationally further a legitimate state interest" (*Affronti v Crosson*, 95 NY2d 713, 718 [2001]).

Here, the asserted government interest in preventing the sexual victimization of children is plainly legitimate. However, DOCCS' chosen means for effectuating that interest are of dubious rationality.[4] Courts and scholars alike have recognized that residency restrictions do next to nothing to prevent children from being victims of sex crimes (*See Does #1-5 v Snyder*, 834 F3d 696, 705 [6th Cir 2016] [striking down Michigan's sex offender residency requirement in part because there was no evidence "that residential restrictions have any beneficial effect on recidivism rates"]; Jill S. Levenson & Andrea L. Hern, Sex Offender Residence Restrictions: Unintended Consequences and

---

[4] Contrary to the majority's view, petitioners' claims are not challenges to policy, as they do not assert that State elected officials may not enact legislation to protect children. We are not asked to opine on the wisdom of that legislation. Instead, we are called upon to exercise our judicial role and assess the constitutional validity of state action in furtherance of the legislature's goals.

Community Reentry, 9 Just. Res. & Pol'y 59, 61 (2007) [study in Minnesota tracking recidivism rates for people designated high-risk sex offenders found that, of the 4% who committed new sex crimes "(n)one of the new crimes occurred on the grounds of a school or was seemingly related to a sex offender's living within close proximity to a school" and concluding that "residential proximity to schools and parks appeared to be unrelated to sex offense recidivism" and that "blanket-policies restricting where sex offenders live are unlikely to benefit community safety"]). Perhaps most damning is the federal Department of Justice's acknowledgement that residency restrictions appear ineffectual and may actually increase recidivism: "[T]here is no empirical support for the effectiveness of residence restrictions. In fact, a number of negative unintended consequences have been empirically identified . . . that may aggravate rather than mitigate offender risk" (U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics, Sexual Assault of Young Children as Reported to Law Enforcement: Victim, Incident, and Offender Characteristics, at 10 [2000] [noting that in 93% of sex crimes involving children, the perpetrator was someone known to the victim rather than a stranger]; Christopher Lobanov-Rostovsky, Chapter 8: Sex Offender Management Strategies, in Sex Offender Mgmt. Assessment & Planning Initiative, US Dept. of Justice, Office of Justice Programs, Office of Sex Offender Sentencing Monitoring, Apprehending, Registering, and Tracking, NCJ-247059 (Oct. 2014) at 163 available at https://smart.ojp.gov/somapi/chapter-8-sex-offender-management-strategies (last visited Nov. 3, 2020). Further highlighting the lack of correlation between the legislative ends and DOCCS' policy of SARA incarceration, is

DOCCS' failure to contest petitioners' claim that, between 2005 and 2014 (when DOCCS permitted level three sex offenders to reside in non-compliant homeless shelters), there was not a single reported sex offense involving a child perpetrated by a stranger living in a homeless shelter less than 1,000 feet from a school.

Assuming, for a moment, that the foregoing evidence did not strongly suggest the irrationality of DOCCS' chosen course of action, there is no rational justification for the application of this policy to Johnson. The record makes clear that he has never victimized a minor nor committed a crime near a school. Johnson committed his crimes on New York City's subways, against adult females. The State struggles to explain how SARA's restriction could possibly reduce the risk that Johnson would reoffend, given the particulars of his criminal history. It ultimately suggests that Johnson may pivot, altering his modus operandi and suddenly begin victimizing minors, not on the subway but within 1,000 feet of school property. This rank speculation is the kind of "flimsy or implausible justification[]" that fails even the rational basis test (*Fritz*, 449 US at 184).

As to *both* Ortiz and Johnson, DOCCS' SARA incarceration irrationally thwarts the New York State and City legislatures' goals of fostering the successful reintegration of formerly incarcerated individuals into the community (*see e.g. Sparber*, 10 NY3d at 469; *Gonzalez*, 32 NY3d at 480 [Wilson, J., dissenting] ["In all respects, the statutory scheme is one that seeks systematically to remove from the willing inmate the disabilities of past crimes and imprisonment"]; Donnino, Practice Commentary, McKinney's Cons. Laws of NY, Book 39, Penal Law § 70.45, at 396 [2004 ed.] [quoting

Legislative Memorandum which states that PRS is meant to provide "assurance that offenders will be successfully reintegrated into society"]; NYC Commn. on Human Rights, Legal Enforcement Guidance on the Fair Chance Act, Local Law No. 63 [2015] ["The (Fair Chance Act) reflects the City's view that job seekers must be judged on their merits before their mistakes . . . [and] is intended to level the playing field . . ."]). The irrationality of DOCCS' choice is made plain by its violation of its own policy. As the State concedes, when individuals subject to SARA finally make it off DOCCS' internal waiting list for SARA-compliant housing, DOCCS transports them to the Bellevue Men's Shelter in Manhattan—even though that shelter is within 1,000 feet of a school. And, finally, DOCCS' insistence that the policy is not merely rational but also necessary is belied by the fact that SARA's restriction is finite in duration; it is only mandatory during an offender's sentence.

Thus, DOCCS' chosen means of effectuating the State's legitimate interest in protecting children beggars all rationality. Not only is it unsupported by the scientific literature, but DOCCS' historical practice—where, for 9 years, it did the very thing it claims it now cannot do without jeopardizing the wellbeing of children—lends it no support. So irrational is DOCCS' policy of continuing an offender's confinement while simultaneously prohibiting them from exercising the right to request shelter directly from DHS, that the agency repeatedly ignores its own dictates when it eventually releases level three offenders (after, potentially, years of confinement) to the Bellevue shelter. All this, too, at the expense of legislative goals meant to facilitate the reintroduction of individuals on conditional release *back* to their home communities.

## B. Intermediate Scrutiny

Regardless of whether DOCCS' SARA incarceration of indigent individuals who are reliant on shelter housing—and their resulting, potentially indefinite, confinement—survives rational basis review, the question remains whether it survives heightened intermediate scrutiny. Under our precedent's reasoning, the policy falls short of that threshold and is therefore unconstitutional.

This Court has regularly applied intermediate scrutiny when the question presented implicates *both* a constitutional right and a concededly legitimate state action. For instance, First Amendment challenges to local zoning laws that burden expressive activity trigger intermediate scrutiny (*see e.g. Town of Delaware v Leifer*, 34 NY3d 234, 244 [2019]; *For the People Theatres of NY Inc. v City of New York*, 29 NY3d 340, 358 [2017]; *see also Expressview Dev., Inc. v Town of Gates Zoning Bd. of Appeals*, 147 AD3d 1427, 1431 [4th Dept 2017] [restrictions on commercial speech trigger intermediate scrutiny]). Similarly, Second Amendment challenges to certain firearm-related State laws warrant intermediate scrutiny (*see People v Hughes*, 22 NY3d 44, 51 [2013]; *see also Delgado v Kelly*, 127 AD3d 644, 644 [1st Dept. 2015]).[5]

---

[5] The Court has also applied a standard of review higher than rational basis in a number of Equal Protection Clause cases, including those that predate the emergence of the term "intermediate scrutiny" (*see e.g. Matter of Fay's Estate*, 44 NY2d 137, 144 [1978] ["(a)pplying a less than strict scrutiny, but yet not a 'toothless' standard of review" to assess Equal Protection challenge to intestacy statute disadvantaging children born out of wedlock]; *Alevy v Downstate Med. Ctr. of State of NY*, 39 NY2d 326, 384 [1976] [applying a form of scrutiny higher than rational basis to evaluate Equal Protection challenge to affirmative action admissions practices at a medical school]).

Most relevant to these appeals is *Cooper v Morin* (49 NY2d 69 [1979]), which resolved a constitutional challenge to pretrial confinement at the Monroe County jail. The plaintiffs, a class of female detainees, alleged that correctional officials violated their State and Federal constitutional rights by prohibiting any contact with visitors during jail visits. The Court acknowledged the holding of *Bell v Wolfish* (441 US 520 [1979]) that the Federal Constitution mandates some system of visitation for pretrial detainees, but that the manner and duration of the visits are wholly within the discretion of prison officials and, therefore, beyond judicial supervision (*Cooper*, 49 NY2d at 75). Our Court recognized that *Bell* rejected "an intrusive standard of review" (*id.* at 76) applicable to the due process claims of pretrial detainees regarding the conditions of their confinement (*see e.g. id.* at 77 [describing *Bell*'s application of rational basis and surveying additional United States Supreme Court precedent applying the same standard to pre-trial detainees' constitutional challenges]). Applying that precedent, the Court held that "neither as a matter of Federal due process nor Federal equal protection are plaintiffs entitled to an order requiring the allowance of contact visits" (*id.* at 78).

However, "[t]hat conclusion d[id] not end the inquiry," because plaintiffs asserted State constitutional claims (*id.*). Those claims prevailed. The Court explained that it

> "c[ould] not agree that the validity of the regimen imposed upon such persons during detention turns on no more than whether a regulation has a legitimate purpose other than punishment and is not excessive in relation to that purpose. So one-sided a concept of due process we regard as unacceptable. In our view what is required is a balancing of the harm to the individual resulting from the condition imposed against the benefit sought by the government through its enforcement" (*id.* at 79).

Central to the analysis in *Cooper* was the fact that the no-contact policy severely impinged upon the plaintiffs' "fundamental right to . . . family life on the one hand and to . . . rear children on the other" (*id.* at 80). In other words, heightened review applied because the governmental action at issue in *Cooper* impinged upon the plaintiffs' constitutionally protected rights, even though the plaintiffs, like petitioners here, were lawfully in State custody.

That the State was permitted, after arresting and charging the plaintiffs with crimes, to detain them to ensure their appearance at trial did *not* mean that any rational restriction on their constitutionally protected rights was also permitted. The majority rejected the dissent's view that petitioners had no constitutionally protected rights because "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by our penal system . . . [and] there are certain personal freedoms and conveniences that must be sacrificed as a necessary incident to the loss of liberty" (*id.* at 84-85 [Gabrielli, J., dissenting] [internal citations and alterations omitted]). The dissent argued, similarly to the State here, that any fundamental rights must give way to a compelling governmental interest, particularly in light of "the relatively short duration of [the individual's] confinement" (*id.* at 85).

Instead of adopting this narrow view of our State due process protections, the Court examined the constitutional interests implicated by the challenged State action and weighed them against the interests asserted by the State. The *Cooper* Court made clear that the right it sought to protect through heightened review was broader than just the right to parent;

instead, it encompassed the right to be in the community generally—a fundamental right that was not rendered wholly meaningless by virtue of the right-holder's detention (*see* 49 NY2d at 81 ["(W)hen so *fundamental a right* as the maintenance by pretrial detainees of relationships with family *and friends* is involved the measure adopted must be both reasonable and necessary to the maintenance of security"] [emphasis added]).

The reasoning of *Cooper* applies with equal force to petitioners here. As an initial matter, the same fundamental right at issue in *Cooper* is clearly implicated in the case of Ortiz, whose desire to maintain his relationship with his young daughter was central to his decision to seek release on PRS in New York City (as the record repeatedly makes clear). DOCCS' refusal to release Ortiz absent a SARA-compliant address and its denial of his request to directly seek shelter in the City, therefore, thwarted his attempts to vindicate his long-recognized fundamental right to parent (*see People ex rel. Portnoy v Strasser*, 303 NY 539, 542 [1952] ["(T)he right of a parent, under natural law, to establish a home and bring up children is a fundamental one and beyond the reach of any court"]).

Here, the importance of the right to be in the community and to "maintain[] . . . relationships with family and friends" (*id.*) is, arguably, even greater for individuals on PRS who, by virtue of DOCCS' SARA incarceration, remained confined in a correctional facility euphemistically labeled an RTF—despite the fact that this portion of their sentence is supposed to be served at liberty in the community. "Postrelease supervision is significant" (*People v Catu*, 4 NY3d 242, 245 [2005]), and DOCCS' abridgement of it— particularly when that action simultaneously works harm on fundamental rights—must be subjected to something more searching than mere rational basis.

To be sure, the Constitution permits the State to infringe upon the rights of someone serving a sentence upon a lawful conviction, and an individual's right to "conditional liberty [is] properly dependent on observance of special parole restrictions" (*Morrissey v Brewer*, 408 US 471, 480 [1972]). Nonetheless, the liberty interests of individuals who are presently incarcerated still merit constitutional protection. This is particularly true for individuals, like petitioners, who have either been granted an open parole date or who are currently serving the PRS portions of their sentences (*see id.* at 482 [liberty interest of a parolee, in the context of a revocation hearing, "includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee . . . . By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment"]).

The majority relies heavily on the lack of any right to parole to reach its conclusion that there is no constitutional right—fundamental or otherwise—meriting heightened judicial review (majority op at 11-12). This parsimonious view of individual liberty ignores that once a person *is* granted parole or exceeds the maximum expiration date of the carceral portion of their sentence, they possess far "more than a hope or a unilateral expectation of release" (*Green v McCall*, 822 F2d 284, 288 [2d Cir 1987] [internal quotations omitted]). "[I]nstead, [they] have a legitimate claim of entitlement to it" (*Greenholtz v Inmates of Neb. Penal & Corr. Complex*, 422 US 1, 7 [1979]). In turn, once such individuals have a "legitimate claim of entitlement," the Constitution protects that liberty interest (*see Victory v Pataki*, 814 F3d 47, 60 [2016] ["(A) New York inmate who has been granted an open parole release date has a legitimate expectancy of release that is grounded in New York's

regulatory scheme . . . (and) has a protectable liberty interest that entitles (them) to due process"] [internal citation and quotation omitted]).

While that interest may not rise to the level of a fundamental right, it is nonetheless constitutionally meaningful because it derives from "a legitimate expectancy of release that is grounded in the state's statutory scheme" (*id.* at 60, quoting *Graziano v Pataki*, 689 F3d 110, 114 [2012]). That is all the more true here, where the statutory scheme reflects a clear legislative intent in favor of reentry (*see e.g. People v Sparber*, 10 NY3d 457, 469 [2008] [purpose of PRS is to monitor certain incarcerated individuals "upon their *reintroduction into society*"] [emphasis added]; *see also* Donnino, Practice Commentary, McKinney's Cons. Laws of NY, Book 39, Penal Law § 70.45, at 396 [2004 ed.] [quoting Legislative Memorandum which states that PRS is meant to provide "assurance that offenders will be successfully reintegrated into society"]).

Likewise, New York City's status as a "right to shelter" jurisdiction bolsters the petitioners' legitimate expectation of release and their concomitant liberty interests. Under a 1981 consent decree entered in *Callahan v Carey* (Index # 42582/79 [Sup Ct, NY County 1981]), New York City agreed that it would "provide shelter and board to each homeless man who applies for it" (*Callahan v Carey*, 307 AD2d 150, 151 [2003], quoting consent decree). The *Callahan* consent decree does not have a sex offender exception, and its plain language requires DHS to provide SARA-compliant housing to individuals like petitioners—assuming, of course, DOCCS did not prohibit them from presenting themselves for intake (*see also Callahan v Carey*, 12 NY3d 496, 498 [2009] [requiring the City to "provide shelter and board to each homeless man who applies for it provided that .

. . the man by reason of . . . social dysfunction is in need of temporary shelter"]). Indeed, DHS officials appear to have confirmed this understanding of the consent decree in litigation raising issues similar to those presented in the instant appeals (*see Bonilla v Supt. Fishkill Facility* (No 2020/51174 [Sup Ct, Dutchess County, June 25, 2020]). Supreme Court credited a DHS official's testimony that individuals subject to SARA would be provided compliant beds so long as they presented themselves to DHS shelter intake (*see Gonzalez*, 32 NY3d at 489-490 [Wilson, J., dissenting] ["(H)ad DOCCS released (the petitioner) to any homeless shelter in New York City, the City would have been required to find him a bed, because the City guarantees (and indeed must guarantee) housing for every homeless person who requests it"]; dissenting op of Wilson, J. at 2-5, 21-23 [demonstrating the breadth of the City's obligation to provide homeless individuals like petitioners with housing upon request]). Thus, in addition to New York State's reentry-promoting conditional release scheme, New York City's provision of shelter to indigent individuals further strengthens petitioners' liberty interest in and their expectation of unobstructed release on parole and PRS to a New York City shelter.

That New York City, as opposed to some other jurisdiction, guarantees a right to shelter is noteworthy for another reason. Although petitioners expressed some openness to living outside of the City, nothing in the record suggests that, as homeless individuals, they would be able to obtain shelter upon request in another part of the State. Moreover, the petitioners' historical connection to and preference for residing in New York City may reflect government policies resulting in pervasive racial segregation in housing that afflicts New York State generally. In upstate New York (where SARA-compliant housing is not

in such high demand), for example, more than 80% of residents are non-Hispanic whites (*see* Nancy Denton et al., *Metropolitan and Micropolitan New York State: Population Change and Race-Ethnic Diversity 2000-2010*, How the Other Third Lives: A Focus on Upstate New York, http://mumford.albany.edu/mumford/UpstateProject/geography.html). And people of color are concentrated in neighborhoods with the highest poverty rates, adding to the challenges of reentry (*see e.g.* Paul Jargowsky, *Architecture of Segregation: Civil Unrest, the Concentration of Poverty, and Public Policy*, The Century Foundation [Aug. 7, 2015], https://tcf.org/content/report/architecture-of-segregation/?agreed=1 [Syracuse, New York has the highest concentrations of African-American and Hispanic poverty in the nation]).

The significant interests at issue in these appeals, grounded in statutory and regulatory schemes aimed at promoting an individual's reentry into the community, reducing recidivism, and ensuring that they have shelter if they are homeless, demand more scrutiny than mere rational basis review. This is particularly so when the State's infringement of that interest implicates rights that *are* unquestionably fundamental, such as the right to "the maintenance . . . of relationships with family" (*Cooper*, 49 NY2d at 81). Nothing less than intermediate scrutiny serves to protect those rights. *Anonymous v Rochester* (13 NY3d 35, 48 [2009]) supports this conclusion.

In *Anonymous*, the Court considered the appropriate constitutional standard of review for a curfew that restricted minors' freedom of movement. The Court determined that, for adults, such freedom of movement would undeniably constitute a fundamental right warranting strict scrutiny. But, because of the sensitive considerations applicable to

minors, a slightly more lenient form of review (i.e., intermediate scrutiny) should apply. (13 NY3d at 45-47). Specifically, the Court held that, notwithstanding the fundamentality of the right to freedom of movement, courts had long recognized the State's "entitle[ment] to adjust its legal system" when dealing with minors "by exercising broader authority over their activities" (*id.* at 46, quoting *Bellotti v Baird*, 443 US 622, 635 [1979]). As the petitioners argued before this Court, the relationship between an adult's and a minor's freedom of movement is clearly analogous to the relationship between the constitutional right to be free from confinement possessed by those at liberty and those who are incarcerated. That is, an individual who is at liberty has a constitutional right to remain at liberty that merits the protection of the Due Process Clause, even if subject to some additional constraints (*see DeShaney*, 489 US at 200 ["(I)t is the State's affirmative act of restraining the individual's freedom to act on (their) own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause"]).

Intermediate scrutiny is "sufficiently skeptical and probing to provide rigorous protection of constitutional rights yet flexible enough to accommodate legislation that is carefully drafted to address" particularly sensitive cases (*Anonymous*, 13 NY3d at 47). Indeed, it is precisely for this reason that New York courts have routinely found it appropriate when considering the extent to which the State may, in service of certain important State functions, constitutionally impinge upon liberties enshrined in the Constitution (*see e.g. Town of Delaware*, 34 NY3d at 244 [applying intermediate scrutiny when balancing First Amendment rights against municipal zoning needs]; *Hughes*, 22

NY3d at 51 [applying intermediate scrutiny when balancing Second Amendment rights against State criminal law prohibiting certain possessions of firearms]; *Alevy*, 39 NY2d at 384 [applying intermediate scrutiny balancing Equal Protection concerns about disparate treatment based on race with the need to compose a racially diverse class of medical students]).

Due consideration of both sides of the ledger in these appeals does not require the Court to resort to the most stringent tier of constitutional review. Indeed, the Court may take into account the State's legitimate concerns while simultaneously affording the petitioners "rigorous protection of [their] constitutional rights" (*Anonymous*, 13 NY3d at 47)—so long as it ensures that the level of scrutiny it applies to petitioners' claims is "not a 'toothless' standard of review" (*Matter of Fay's Estate*, 44 NY2d at 144). That standard—neither hyper-stringent nor utterly toothless—is intermediate scrutiny.

Applying that standard here, I conclude that DOCCS' policy of SARA incarceration of indigent individuals is unconstitutional. As discussed above, it is doubtful that the application of SARA's restriction to petitioners achieves the statute's legislative goals given the lack of evidence linking recidivism involving minors with SARA's school grounds restriction. But even if that were not the case, DOCCS' policy does not further correctional interests; it is intended as a stopgap for perceived administrative and budgetary constraints facing DHS (*see* dissenting op of Wilson, J. at 25-26 ["DOCCS's cooperation with DHS serves a convenient purpose of allowing DHS to control access to shelter space; it does not alter the City's obligations under the *Callahan* consent decree to provide shelter to homeless individuals"]). In other words, DOCCS denies release not because continued

incarceration serves the goals of the correctional system, or because it furthers individual reentry programming, but because DOCCS has concluded that it would be logistically difficult for the City to provide a SARA-compliant shelter bed upon request to sex offenders. However, DHS is obligated to provide shelter to those homeless individuals who seek it (*see Callahan*, Final Judgment by Consent at ¶ 1; dissenting op of Wilson, J. at 2-5, 21-23).

DOCCS argues that it must incarcerate individuals like petitioners until they have secured a SARA-compliant address, but DOCCS admits that it prevents offenders from requesting compliant shelter from DHS at the time of their scheduled release. In reality, we do not know if DHS will fail to comply with its obligations. As Judge Wilson explains in his dissent, which I join[6], there is no reason to believe it will not (dissenting op of Wilson, J. at 21-23, 23 n 11). DOCCS' and the majority's assertion that indigent persons who need housing in the City will automatically violate SARA upon release, absent DOCCS' policy (majority op at 13), is unsupported by this record. Instead, by limiting the number of person's subject to SARA who present themselves to DHS on any given date, DOCCS has effectively minimized the demand on the City, at the cost of petitioners' liberty. Other than the shelter vacancy rate, the State has no evidence to support its determination that the City would fail to abide by its obligations under the *Callahan* consent decree. Any speculation

---

[6] To the extent that Judge Wilson's dissent asserts that the rights afforded an individual who has been released are subject to strict scrutiny, I agree. However, I need not, and do not, opine as to whether strict scrutiny applies to individuals who have an expectation of release but who have not yet been released. As I discuss, DOCCS' application of SARA to petitioners cannot survive even intermediate scrutiny.

about the legal rights of petitioners to shelter in the City is a matter to be resolved by the parties to the consent decree or, if necessary, through litigation seeking to modify or terminate the consent decree (*see Callahan*, 12 NY3d at 502). Perversely, DOCCS' policy has made it impossible to resolve the alleged "short supply" problem.

Moreover, DOCCS' policy must be assessed in light of the competing statutory and regulatory scheme governing parole and PRS. Continued incarceration, perhaps prolonged indefinitely, does nothing to further the legislative goals of providing parole in appropriate cases and completion of the PRS sentence in the community. Both are intended to facilitate successful reentry and reduce recidivism. If there are administrative, budgetary or legal obstacles to fulfilling the commands of the legislative enactments described above, those challenges must be addressed by our elected officials not DOCCS (*see Rent Stabilization Assn. of N.Y. City v. Higgins*, 83 NY2d 156, 174 [1993] ["the general wisdom or desirability" of State's economic choices "is a question for the legislature"]; *Saxton v Carey*, 44 NY2d 545, 549 [State's budgetary priorities "is for the Legislature to review," rather than the courts]). Nor may this Court approve of constitutional violations caused by well-meaning corrections officials.[7]

---

[7] Since I would reverse on due process grounds, I have no occasion to consider Ortiz's Eighth Amendment argument or his challenge to his incarceration in an RTF without residential-type privileges.

WILSON, J. (dissenting):

No party disputes that persons adjudged to be dangerous sex offenders can live in New York City. They can and do. No party contends that the State may confine Mr. Ortiz or Mr. Johnson indefinitely if they are eligible for release but never able to find SARA-

- 1 -

compliant housing. Doing so would violate the Constitution. Instead, the question we must decide is when was the State obliged to release Mr. Ortiz and Mr. Johnson, both of whom were held in correctional facilities for years after they had secured parole, and in Mr. Ortiz's case, for 8 months past the maximum length of his sentence, allegedly because of their inability to find housing.

Had Mr. Ortiz or Mr. Johnson signed a lease on an apartment or placed a down payment on a SARA-compliant house, we would undoubtedly have enjoined the State from obstructing their legal right to housing, not to mention their rights of freedom of association and liberty. Too poor to afford housing, Mr. Ortiz and Mr. Johnson sought to avail themselves of their legal right to stay in a New York City homeless shelter.

Today, the majority takes the extraordinary step of declaring that a state agency can refuse to recognize a legal right guaranteed by the City of New York and enshrined in a legally enforceable consent decree entered as a court order. State agencies may not imprison people based on the belief that legal rights will not be vindicated. Accordingly, I dissent.

I.

A.

Since 1981, homeless people in New York City have had a legal right to shelter. That right arose out of a class-action lawsuit brought by Robert Callahan and a group of homeless men who challenged the inadequate capacity and substandard quality of New York City's homeless shelters (*see generally Callahan v Carey*, 12 NY3d 496 [2009] [relating the history of the consent decree]). Citing the State's obligation to provide for the

"aid, care and support of the needy" under Article XVII of the New York State Constitution, the plaintiffs argued that a right to shelter for the homeless existed under state law (*see Callahan v Carey*, Amended Complaint at 9, Index No. 72581/79 [Sup Ct, NY County, April 30, 1980], *available at* https://www.coalitionforthehomeless.org/wp-content/uploads/2014/08/CallahanAmendedComplaint-1.pdf).  To settle that lawsuit, New York City entered into a consent decree in which the City committed to house every homeless man who presented himself at a City intake shelter.  Paragraph 1 of the consent decree, entitled "Provision of Shelter," sets forth the basic right:

> "The City defendants shall provide shelter and board to each homeless man who applies for it provided that (a) the man meets the need standard to qualify for the home relief program established in New York State; or (b) the man by reason to physical, mental or social dysfunction is in need of temporary shelter."

(*Callahan v Carey*, Final Judgment by Consent at ¶ 1, Index No. 42582/79 [Sup Ct, NY County, August 1981] [hereinafter "*Callahan* Consent Decree"], *available at* https://www.coalitionforthehomeless.org/wp-content/uploads/2014/06/CallahanConsentDecree.pdf).  The subsequent paragraphs detail standards for the quality of life that each shelter must meet, a system for monitoring the City's performance, and, as relevant here, procedures for submitting and accepting applications for shelter.  To wit, Paragraph 5 begins:

> "The City defendants shall accept applications for shelter at the Men's Shelter, 8 East Third Street, New York, New York and at 529 Eighth Avenue, New York, New York (the "central intake center"). Applications for shelter shall be accepted at all times at the Men's Shelter . . . . The City defendants shall provide direct transportation to shelter pursuant to paragraph

> 1, supra . . . . The City defendants shall accept applications for shelter at shelter facilities providing that such applicants have applied for and have been found eligible for shelter by the City defendants within six months of the time of application at a shelter facility."

(*Callahan* Consent Decree at ¶¶ 5-7).  The consent decree definitively establishes the scope of the City's commitment.  The City must provide shelter to "each man who applies" (subject to meeting the criteria of financial or personal need) and applications must be accepted "at all times" at the central intake facility or one of the City's satellite facilities.

The City's obligation, as we have repeatedly explained, "is in the nature of a contract" (*Callahan*, 12 NY3d at 395, quoting *19th St. Assoc. v State of New York*, 79 NY2d 434, 442 [1992]; *accord Callahan v Carey*, 307 AD2d 150, 153 [1st Dept 2003]).  That guarantee is overseen and enforced by the courts of New York (*see Childs v Levitt*, 151 AD2d 318, 320 [1st Dept 1989], *lv denied* 74 NY2d 613 [1989] [noting that a "settlement entered as a consent decree . . . operates as a binding contract" which "the courts are bound to enforce"]).  As the U.S. Supreme Court has noted, "[c]onsent decrees have elements of both contracts and judicial decrees" (*Frew ex rel. Frew v Hawkins*, 540 US 431, 437 [2004]), but in many ways are easier for courts to enforce than ordinary contracts (*see Local No. 93, Intern. Assn. of Firefighters, AFL-CIO C.L.C. v City of Cleveland*, 478 US 501, 523 n 13 [1986] [emphasizing that with a consent decree, courts maintain continuing jurisdiction over the decree, possess a "more flexible repertoire of enforcement measures," and do not need to rehash "many facts that would otherwise have to be shown in order to establish the validity of an ordinary contract"] [quoting with approval brief for Nat League of Cities et al. as *Amici Curiae* at 25]).

Over four decades, New York courts have reaffirmed and extended the City's binding contractual obligation to provide shelter to those in need. In the years following the entry of the original consent decree, New York expanded the decree to guarantee shelter not only for homeless men, but also for homeless women (*Eldridge v Koch*, 98 AD2d 675 [1st Dept 1983]) and families with children (*Matter of McCain v Koch*, 117 AD2d 198, 222 [1st Dept 1986], *revd in part*, 70 NY2d 109 [1987] [affirming a right to shelter for families with children, a holding not disturbed by the Court of Appeals]). In 2009, our Court confirmed the continued force of the *Callahan* consent decree, holding that the City must honor its commitments, including as they pertain to the disclosures and record-keeping required for monitoring the City's compliance (*Callahan v Carey*, 12 NY3d 496 [2009]). In our 2009 decision, we noted that if "the City defendants consider the consent decree to be outmoded and cumbersome, they may always seek to modify or terminate it as provided for by paragraph 19" (*id*. at 502). Because such a modification or termination has not occurred, the City remains obligated to provide shelter to those in need.[1]

B.

---

[1] In the decades since the *Callahan* consent decree entered into force, other jurisdictions have followed New York City in establishing a legal right to shelter (*see* D.C. Code § 4-753.01 [c] [1] [providing that "the District shall make available appropriate space in District of Columbia public or private buildings and facilities for any resident of the District who is homeless and cannot access other housing arrangements," whenever the actual or forecasted temperature falls below 32 degrees Fahrenheit or above 95 degrees Fahrenheit]; Massachusetts L1983, ch 450 [mandating that the state provide temporary emergency shelter to every eligible man, woman and child]).

Mr. Ortiz and Mr. Johnson sought to avail themselves of their legal right to shelter. Both men, by virtue of their convictions and risk level designations under the Sex Offender Registration Act (SORA), were subject to strictures of the Sexual Assault Reform Act (SARA), including its limitations on entering school grounds. SARA directs the parole board to "require, as a mandatory condition of . . . release, that such sentenced offender shall refrain from knowingly entering into or upon any school grounds . . . or any other facility or institution primarily used for the care or treatment of persons under the age of eighteen" (Executive Law § 259-c [14]). The statutory definition of "school grounds" includes not only schools but also "any area accessible to the public located within one thousand feet of the real property boundary line" of a school (Penal Law § 220.00 [14]).

On its face, SARA is a trespass statute—the law prohibits sex offenders from "knowingly entering" a publicly-accessible area within a thousand feet of a school.[2] DOCCS interprets the statute by diverging from its plain language in three ways. First, DOCCS has interpreted SARA as a residency statute that imposes a pre-clearance requirement on people seeking to be released from prison.[3] Consequently, DOCCS

_____

[2] "Knowingly enter" is the phrase New York penal statutes typically employ to denote the crime of trespass (*see* Penal Law § 140.10 ["A person is guilty of criminal trespass in the third degree when he *knowingly enters* or remains unlawfully in a building or upon real property . . . ."]; Penal Law § 140.15 [similar]).

[3] Although the petitioners here do not raise this claim, other litigants have successfully argued that the statute as applied by DOCCS is unconstitutionally vague. In 2019, a federal district court granted a preliminary injunction barring the enforcement of SARA's 1000-foot requirement as applied to a parolee who had not committed a sexual offense against a minor. The court reasoned that SARA's expansive language "authorizes or even encourages arbitrary and discriminatory enforcement" (*Yunus v Robinson*, 17-CV-5839 [AJN], 2019 WL 168544, *13 [SDNY Jan. 11, 2019], *appeal withdrawn sub nom Yunus v*

requires parolees and people on post-release supervision to locate and have verified by

DOCCS a SARA-compliant residence before they can be released. Second, DOCCS

applies its SARA residency requirement to wholly private residences, even though most

private residences are not "area[s] accessible to the public." [4] And third, DOCCS applies

a 1,000-foot buffer to child care facilities even though the text of the statute applies that

buffer to schools only, and not to child care facilities.[5]

---

*Lewis-Robinson*, 2019 WL 3814554 [2d Cir May 15, 2019], quoting *Hill v Colorado*, 530 US 703, 732 [2000]). The court rejected the argument that DOCCS's "informal enforcement practices" (enforcing SARA only as to residency) saved the mandatory conditions of parole from vagueness because the statute fails to provide even "minimal guidelines to govern law enforcement" and therefore "places almost limitless discretion in the hands of Plaintiff's parole officers to arrest him for traveling almost anywhere in the city that he lives, raising precisely the concerns that [the] void-for-vagueness doctrine seeks to prevent" (*id.*).

[4] DOCCS has historically refused to permit sex offenders to comply with SARA by committing to stay within a private residence, *i.e.*, a form of house arrest (*see e.g. Berlin v Evans*, 31 Misc 3d 919 [Sup Ct, NY County 2011], *appeal dismissed* 103 AD3d 405 [1st Dept 2013] [describing how DOCCS refused to permit the petitioner to live in his private apartment even though he "agree(d) to remain in his apartment at all hours and arrange for friends to deliver groceries and mail it to him"]). Such commitments to house arrest illustrate the harsh penalties of SARA, although many parolees may prefer confinement at home to confinement at a correctional facility. If DOCCS's rejections of such requests are based on SARA's school grounds restriction, its decisions are likely *ultra vires*.

[5] Executive Law § 259-c (14) prohibits sex offenders who are subject to SARA from "knowingly entering into or upon any *school grounds*, as that term is defined in subdivision fourteen of section 220.00 of the penal law, *or any other facility or institution* primarily used for the care or treatment of persons under the age of eighteen . . . ." (emphasis added). Executive Law § 259-c (14) does not include a blanket 1,000-foot buffer for all facilities used for the care of children. Instead, the 1,000-foot buffer applies only to "school grounds" as defined in Penal Law § 220.00 and not to other facilities— like daycare centers—that are used for the care of children. The plain language of the statute accords with the rationale behind the 1,000-foot buffer, which is that school-age children congregate in the vicinity of schools. That rationale may not apply to other

Locating SARA-compliant housing in New York City is virtually impossible.

Whereas a paroled sex offender might easily find SARA-compliant housing in bucolic

Hamilton County, SARA, as interpreted by DOCCS, cordons off almost all residential

areas of New York City, simply because the population is so dense. Trace a circle with a

radius of 1,000 feet—roughly the equivalent of 4 city blocks—around each school and

child care facility and all that remains are scattered and disconnected tracts where sex

offenders may live among a sea of unhabitable zones (*see* Allison Frankel, *Pushed Out and

Locked In: The Catch-22 for New York's Disabled, Homeless Sex-Offender Registrants*,

129 Yale LJ Forum 279, 286 [2019] ["Given the abundance of schools and population

density in New York City, the one-thousand-foot restriction puts most of the City, and

practicably all of Manhattan, off-limits to registrants"]; *Gonzalez v Annucci*, 32 NY3d 461,

462 [2018] [noting the "dearth of SARA-compliant housing in New York City"]; *Williams

v Deptartment of Corrections and Community Supervision*, 136 AD3d 147, 166 [1st Dept

2016] [Kapnick, J., dissenting in part] ["Petitioner's unrebutted evidence establishes that

he is barred from living in or traveling to virtually all parts of Manhattan, where he

allegedly lived for more than 20 years before his incarceration, and large areas of the other

boroughs of New York City"]). SARA places entire neighborhoods off limits, preventing

---

facilities used for the care of children and certainly does not apply to child care facilities
(toddlers who attend daycare generally do not go out unsupervised to get pizza). Mr.
Ortiz did not raise that argument when DOCCS prohibited him from living with his
mother, even though DOCCS's explanation was that his mother's apartment building
included a daycare facility. Therefore, in this appeal, we cannot rule in Mr. Ortiz's favor
based upon DOCCS's questionable (and extra-textual) imposition of a 1,000-foot trespass
zone around daycare facilities.

recently released inmates from living with family and accessing networks of community support (*see* Jill S. Levenson & Andrea L. Hern, *Sex Offender Residence Restrictions: Unintended Consequences and Community Reentry*, 9 Justice Research & Policy 59, 63-68 [2007]).

The daunting task of complying with SARA is made more difficult by DOCCS's method of "assisting" inmates in finding housing. Correction Law § 201 (5) requires DOCCS to assist inmates who are eligible for release in their search for housing. DOCCS's principal method of "assisting" inmates amounts to what is in essence an unwinnable game of real-estate Battleship (*see Gonzalez v Annucci*, 32 NY3d 461, 476 [2018] [Wilson, J., dissenting]). DOCCS provides an inmate with occasional access to a telephone, instructs the inmate to find and propose potential places to live, and then informs the inmate from time to time that the proposed addresses are unacceptable (*see e.g. id.* at 474-475 [describing how an inmate proposed 58 residences over a period of more than 8 months, all rejected by DOCCS]). Inmates who lack access to the Internet or DOCCS's tools for screening proposed addresses are then left to start again. The guessing game continues; another address is rejected; the inmate, already approved for release or parole, spends months or years of additional time in confinement.

Although SARA poses formidable challenges for everyone it reaches, people with financial means at least have some possibility of securing release. For sex offenders who are friendless, penniless and homeless, the deck is insurmountably stacked against them. State and federal law and DOCCS's enforcement policies deprive indigent sex offenders of many of the most common avenues for finding shelter. Hundreds of thousands of needy

New Yorkers find homes in public housing facilities; federal law prohibits sex offenders who are subject to lifetime registration from living in public housing (*see* 42 USC § 13663).[6] Many other people rely upon family; SARA renders that option impossible for most residents of New York City, unless a family member has the means and ability to relocate to one of the few SARA-compliant areas.

Prior to 2014, DOCCS implemented one ameliorating policy: it concluded that SARA's residency restriction did not apply to homeless shelters. Thus, from 2005 until 2014, DOCCS released sex offenders to any New York City shelter, even those within 1,000 feet of a school.[7] That policy appears to have struck a reasonable balance between public safety and constitutional and statutory imperatives to release inmates who are entitled to it. According to Mr. Johnson (in a statement DOCCS does not contest), during that time period, there was not a single sex offense reported against a child on or near a

---

[6] Under New York law, sex offenders who are designated a Level III risk of reoffending, as both Mr. Ortiz and Mr. Johnson were, must register for life.

[7] That now-abandoned position found support in rulings from courts in other jurisdictions. In 2001, a federal district court in Michigan held that temporary stays in homeless shelters do not violate Michigan's residency restriction law for sex offenders (*Poe v Snyder*, 834 F Supp 2d 721 [WD Mich 2011]). That law prohibits sex offenders from "resid[ing] within" 1,000 feet of a school (MCL § 28.735 [1]; MCL § 28.733 [f]). In interpreting the word "reside," the court drew on several common dictionaries to construe "reside" as meaning "to dwell permanently" or "for a considerable time" (*Poe*, 834 F Supp 2d at 733). As a result, the court concluded that temporary stays at homeless shelters would not violate Michigan's residency restriction statute, regardless of where the shelter is located. The language of Michigan's statute differs from that of New York's statute, but it shows that DOCCS's current interpretation of SARA rests on unstable ground. DOCCS insists on interpreting SARA, which employs the language of trespass, as a statute imposing a "residency requirement." However, if SARA were a residency statute, no violation would occur from temporary stays in homeless shelters.

school ground in which the perpetrator was a stranger living in a nearby shelter. That fact is not surprising. Research consistently shows that the vast majority of sex offenses are committed by perpetrators who already know the victim, and not as the debunked stereotype would hold, by strangers lurking in or around schools (*see State v Floyd Y.*, 56 Misc 3d 271, 275 [Sup Ct, NY County 2017] [noting that "(t)here is no evidence the 1,000 foot rule promotes public safety . . . (and the) notion that the typical sex offender commits crimes against strangers he opportunistically encounters in public places, like children near schools, is a myth"]; *see also* Christopher Lobanov-Rostovksy, *Sex Offender Management Strategies*, in Sex Offender Management Assessment and Planning Initiative 181, 197 (National Criminal Justice Association, March 2017] [reporting that 94.1% of child molestation arrests in New York State involve first-time offenders]; *id.* at 202-204 [reviewing studies of residency restriction laws from Colorado, Florida, New York, Iowa, and Minnesota finding no evidence that such laws reduce recidivism for sexual assaults against children]).

In 2014, DOCCS reversed its position and concluded that it would no longer release sex offenders subject to SARA's school requirement to homeless shelters that are within 1,000 feet of a school. Since then, New York courts have seen increasing litigation concerning DOCCS's refusal to release people who have earned parole or post-release supervision to the New York City public shelter system—including people who, like Mr. Ortiz, pleaded guilty at a time when they could have counted on being released to a shelter

after the expiration of their sentence.[8]   The New York City shelter system houses

approximately 57,660 homeless individuals each night (*see* Coalition for the Homeless,

*New York City Homelessness: The Basic Facts* [Oct. 2020], *available at*

https://www.coalitionforthehomeless.org/wp-

content/uploads/2020/10/NYCHomelessnessFactSheet8-2020_citations.pdf].    However,

according to DOCCS, New York City is capable of receiving only ten new sex offenders

each month.  DOCCS has, therefore, created an internal waitlist for releasing people to the

New York City shelter system.

## C.

As Mr. Ortiz and Mr. Johnson's stories both demonstrate, the process of seeking

release from prison is, for homeless sex offenders, a Sisyphean task with Ixionian result.

Mr. Ortiz was convicted in 2008 of robbery and attempted sexual abuse.  After serving

eight and a half years in prison, he earned enough good time credits to be granted an early

parole date.  Mr. Ortiz, who grew up in New York City, initially sought to reunite with his

mother and daughter.  Mr. Ortiz's daughter was born shortly before his incarceration, and

during Mr. Ortiz's years of incarceration, father and daughter maintained a relationship

---

[8] *See e.g. Matter of Arroyo v Annucci* (61 Misc 3d 930 [Sup Ct, Albany County 2018] [finding that the continued confinement of an elderly, disabled Level I sex offender past the maximum expiration of his sentence, on the ground that he lacked SARA-compliant housing, violated substantive due process]); *Alcantara v Annucci* (55 Misc 3d 1216[A], 2017 WL 1838729, *5, *11 [Sup Ct, Albany County 2017] [dismissing petitioner sex offenders' claim that the State lacked statutory authority to detain them in RTFs beyond six months, and denying the petitioners' request for a court order against the City on the ground that the City respondents had already placed three of the named petitioners in DHS shelters and asserted that they had received no shelter applications from the other named petitioners]).

through letters, visits, and phone calls. In the interim, Mr. Ortiz's mother (his daughter's grandmother) acquired joint custody of his daughter to help raise her while Mr. Ortiz was incarcerated.

In the months before his release, Mr. Ortiz proposed living with his mother to help care for his daughter. DOCCS rejected that proposal because his mother's apartment building contained a child care center, and therefore would not comply with SARA. Denied the right to live with his family, Mr. Ortiz tried to find some other place to live. The record shows that Mr. Ortiz proposed dozens of places where he might live. Those residences included apartment buildings, homeless shelters, and hotels where Mr. Ortiz could stay temporarily while he found employment. The proposed residences spanned multiple boroughs of New York City, and included residences outside New York City in Onondaga, Putnam, and Saratoga Counties.

DOCCS rejected every single proposal. Its reasons for rejection ranged from the proximity of schools to the proposed housing, to the cost exceeding DOCCS's budget for assisting parolees with reentry, to DOCCS possessing insufficient information about the landlord.

The record also shows that in the months leading up to Mr. Ortiz's parole date, DOCCS had full knowledge that Mr. Ortiz, who lacked financial resources and could not live with family, would likely need to rely on the New York City public shelter system. A parole officer noted, five months prior to Mr. Ortiz's parole date, that Mr. Ortiz was "undomiciled and [would need to] be referred to Bellevue Men's Shelter," a central DHS

intake facility to which DOCCS regularly transports parolees for processing and admission to the NYC shelter system.

Mr. Ortiz made the request to be released to a shelter, but when his parole date arrived, DOCCS refused to release Mr. Ortiz claiming that he had still been unable to find housing. DOCCS continued to imprison Mr. Ortiz for an additional 17 months until he reached the maximum limit of his sentence.

At that point, rather than release Mr. Ortiz, DOCCS transferred him to Fishkill Correctional Facility. Fishkill Correctional Facility is one of the state prisons that DOCCS has designated to be a "Residential Treatment Facility" (RTF). The legislature intended RTFs to be temporary facilities to provide medical treatment and other "employment, educational, and training opportunities" (Correction Law § 2 [6]) to people who needed it. Mr. Ortiz spent seven weeks at Fishkill Correctional Facility and then was transferred to Queensboro Correctional Facility, another prison DOCCS has designated as an RTF. Mr. Ortiz's time at both "residences" was nearly indistinguishable from his regular prison sentence. Mr. Ortiz was housed with the general population, slept on a bunk bed in a dormitory-style unit, stored his possessions in a small, grey locker given to every inmate, used the same bathrooms, showers, and recreation rooms as the general prison population, and ate his meals in the same mess hall. The principal difference was that Mr. Ortiz was occasionally chosen to join a work crew that unloaded trucks at a nearby police facility, guarded at all times by armed corrections officers. For that work, Mr. Ortiz was paid $10 a day, which would cover a fraction of what it costs for Mr. Ortiz to afford private housing anywhere in New York State.

On June 19, 2018, counsel for Mr. Ortiz filed a writ of habeas corpus seeking to end Mr. Ortiz's continued confinement. In support of the writ, counsel detailed Mr. Ortiz's repeated attempts to secure housing, including his request to live with his mother and help raise his daughter. Accompanying the writ were photographs of Mr. Ortiz's daughter, letters between the two of them, and proof of custody. DOCCS's refusal to let him live with his family and raise his daughter, Mr. Ortiz explained, interfered with his "rights to associate with family and friends and to form other enduring attachments of normal life."

A central feature of Mr. Ortiz's writ was the assertion of his legal right to live in a New York City shelter. Mr. Ortiz explained that because he was a "single resident [of New York City] with no assets or means of financial support, the City is *required* to provide him with shelter." He argued before Supreme Court that because DOCCS kept him in confinement and would not release him to a City shelter, Mr. Ortiz could not "even attempt to exercise his right to such shelter or demand the City live up to its obligations."

Finally, if DOCCS would not release Mr. Ortiz to live with his family or in a New York City shelter, Mr. Ortiz asserted his right to live on the street. Mr. Ortiz's Counsel explained:

> "While Mr. Ortiz would certainly welcome having a home, residence, or shelter that he could reside in during his re-entry into the community, he would rather be homeless, i.e., transient or living on the street, than have to remain incarcerated. At least then, in his words, the 'endless nightmare' would finally be over."

In opposition to Mr. Ortiz's habeas petition, DOCCS acknowledged Mr. Ortiz's request to be released to a New York City Department of Homeless Services (DHS) facility to invoke his right to shelter. However, the agency concluded summarily that "[b]ecause

spaces in one of the New York City DHS facilities are scarce, to the extent that Petitioner asserts that the Court order that he be released from the RTF so that he can demand that the city provide him with SARA-compliant shelter, such an argument should be rejected." On September 5, 2018, Supreme Court denied Mr. Ortiz's writ on the grounds that "Mr. Ortiz has not yet been able to obtain [SARA] compliant community housing" and therefore "his continued detention at a residential treatment facility is appropriate."  Mr. Ortiz appealed and the Appellate Division affirmed, reasoning in similar fashion that Mr. Ortiz had been "unable to locate SARA-compliant housing" (*People ex rel. Ortiz v Breslin*, 183 AD3d 577, 577 [2d Dept 2020]).

Neither court addressed Mr. Ortiz's contention that if DOCCS permitted him to present himself at a DHS shelter, New York City would be legally obligated to provide him with shelter.

D.

Our second appellant, Fred Johnson, was held in prison for years past his parole date, once again because DOCCS refused to release him to the New York City shelter system.  Mr. Johnson was convicted in 2009 of persistent sexual abuse stemming from Mr. Johnson's pattern of rubbing up against women on the subway.  Because of his prior convictions for similar acts, Mr. Johnson was sentenced to a term of two years to life in prison.  After serving eight years of the possible lifetime sentence, Mr. Johnson was granted parole, commencing on August 10, 2017.  When the day arrived, DOCCS refused to release Mr. Johnson, once again on the grounds that he had been unable to secure SARA-compliant housing.

Mr. Johnson is indigent, and, like many people without a home, sought to live either with family or temporarily in a public shelter. DOCCS denied his request to stay with his brother in South Carolina because his brother had also been convicted of committing sex offenses and the South Carolina Probation Department prohibits two sex offenders from living with each other. Mr. Johnson next proposed being released to the Bellevue Men's Shelter. DOCCS informed Mr. Johnson that it had a "comprehensive" waitlist of all inmates seeking to be released to a New York City shelter and that DOCCS would not release Mr. Johnson until he reached the top of the list. (That event would not occur until more than two years had elapsed.)

Mr. Johnson filed a writ of habeas corpus seeking to compel DOCCS to release him to a SARA-compliant residence. Supreme Court denied his writ, and the Third Department affirmed (*People ex rel. Johnson v Superintendent, Adirondack Correctional Facility*, 174 AD3d 992 [3d Dept 2019]). The Third Department reasoned that the State may constitutionally impose "reasonable residential restrictions" before releasing inmates on parole (*id*. at 994). In a concurrence, Presiding Justice Garry observed that Mr. Johnson's "limited social and financial resources make a homeless shelter his only realistic housing option" (*id*. at 996 [Garry, P.J., concurring]). Justice Garry noted that DOCCS's internal waitlist for release to a New York City shelter, by DOCCS's calculation, had grown to approximately 295 inmates, with an average waiting time of 2-3 years (*id*.). The waitlist was created through "an agreement by which DHS reserves certain shelter beds for those under the supervision of DOCCS" (*id*.).

Neither the Appellate Division majority nor concurrence addressed whether that "agreement" to prevent Mr. Johnson from appearing at a New York City shelter, and thereby claim his *Callahan* right to shelter, was legal.  As discussed below, it is not.

## II.

Our Constitution does not sanction a prisoner's indefinite incarceration beyond the sentence imposed by a court.  Writing for a unanimous Supreme Court, Justice Cardozo made clear that "[t]he only sentence known to the law" is the sentence entered by a court (*Hill v United States ex rel. Wampler*, 298 US 460, 464 [1936]).  Accordingly, the question before our Court is not whether the State should set at liberty individuals designated as sex offenders who reach the end of their prison sentences; the State *must* release individuals after its power to incarcerate them ends.  The question is at what point the State must release individuals who have earned an open parole date, like Fred Johnson, or who have reached their term of post-release supervision after completing a determinate prison sentence, like Angel Ortiz—and what rights those individuals have around the point of release.[9]

The reason the State must at some point release them is that they have a right to be free from confinement that is protected by the Due Process Clause of the United States

---

[9] Mr. Ortiz asserts that DOCCS effectively modified the terms of his judicially imposed sentence by confining him in an RTF for eight months of his PRS term following the maximum expiration of his prison sentence, which due process forbids (*see People v Estremera*, 30 NY3d 268, 270 [2017], citing *People v Catu*, 4 NY3d 242, 245 [2005] [when a defendant was not informed that the consequences of his guilty plea included a mandatory PRS term accompanying his prison sentence, due process required vacatur of the defendant's guilty plea]; *see also* Brief of Appellate Advocates in *People ex rel. Ortiz v Breslin*).  In these circumstances, the logic of our precedent does not require a vacatur of his plea, but, as he contends, a grant of his habeas petition.

Constitution and by the terms of their plea and sentence (*see Foucha v Louisiana*, 504 US 71, 80 [1992] ["(C)ommitment for any purpose constitutes a significant deprivation of liberty that requires due process protection"]; *Deshaney v Winnebago County Dept. of Social Servs.*, 489 US 189, 200 [1989] [Due Process protections are triggered by "the State's affirmative act of restraining (an) individual's freedom to act on his own behalf— through incarceration, institutionalization, or other similar restraint of personal liberty"]; *Sandin v Conner*, 515 US 472, 484 [1995] [The Due Process Clause protects against restraints that exceed a prisoner's sentence in an "unexpected manner," and those that impose "atypical and significant hardship(s)"]. The protections of the Due Process Clause, as the majority recognizes, undoubtedly extend to incarcerated individuals. Those protections include "a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them" (*Zinermon v Burch*, 494 US 113, 125 [1990] [internal quotation marks and citations omitted]). In addition, due process requires procedural safeguards against the deprivation of liberty and property interests created by the State, including a parole grantee's "legitimate expectation of early release from prison" under the State's sentencing scheme (*Russo v NY State Bd. of Parole*, 50 NY2d 69, 73 [1980]; *see also Victory v Pataki*, 914 F3d 47, 59 [2d Cir 2016] ["(A) New York parole grantee . . . has a liberty interest in his open release date of which he may not be deprived without due process"]).

In their respective as-applied challenges, the petitioners assert that their prolonged confinement in correctional facilities, on the ground that they had not secured SARA-compliant housing, was unlawful. Mr. Johnson argues that DOCCS's deprivation of his

liberty interest, as a parole grantee subject to a potential life sentence, violated substantive due process. Mr. Ortiz also asserts a substantive due process violation based on DOCCS's deprivation of his interest in conditional release and his continued incarceration in an RTF after the maximum expiration of his prison sentence. Both petitioners recognize that their liberty interests are cabined by New York's statutory scheme governing parole and PRS, and by the conditions imposed on certain sex offenders subject to SARA. Neither petitioner asserts a right to be free from lawfully imposed conditions of release. Rather, they argue that DOCCS violated substantive due process by refusing to permit them to appear at DHS intake to claim their unequivocal right to shelter—in effect, cutting off their right to comply with SARA's conditions outside of prison. In Mr. Ortiz's case, prolonged detention cut off "perhaps the oldest of the fundamental liberty interests recognized by [the U.S. Supreme] Court," namely, his interest as a parent in the "care, custody, and control" of his child (*Troxel v Granville*, 530 US 57, 65 [2000]).[10] However, the majority concludes

---

[10] Although SARA's mandatory condition does not expressly prohibit SARA-restricted individuals from living with family members upon release, DOCCS's application of SARA to prevent Mr. Ortiz from living with his daughter and mother—and to prevent contact with his daughter during his confinement in an RTF—curtailed Mr. Ortiz's parental rights and right to familial association. Individuals subject to correctional supervision retain those fundamental rights (*see generally United States v Myers*, 426 F3d 117, 125 [2d Cir. 2005] [vacating a special condition of supervised release that barred a defendant from visiting his son without the probation office's preclearance, a condition "implicating a fundamental liberty interest protected by due process"]; *Maldonado v Mattingly*, 2019 WL 5784940, *10 [WDNY Nov. 6, 2019] [denying the defendant parole officer's motion for summary judgment with respect to the plaintiff SORA registrant's claim that special conditions of parole prevented him from contact with his children in violation of substantive due process]). Thus, to the extent that Mr. Ortiz asserts that DOCCS violated his fundamental right to family integrity, DOCCS's actions are properly subject to strict scrutiny (*see generally Troxel*, 530 US at 66 [affirming that "the Due Process Clause of the Fourteenth Amendment protects the

that "the temporary confinement of [Johnson and Ortiz] in correctional facilities, while on a waiting list for SARA-compliant DHS housing" (majority op at 16), fell lawfully within DOCCS's authority under the State's regulatory scheme.

In truth, though, it is not DOCCS's authority under the Penal or Correction Laws, nor its duty to foster compliance with SARA, that defeated Mr. Johnson and Mr. Ortiz's right to liberty.  The actual basis for DOCCS's indefinite confinement of individuals like Mr. Johnson and Mr. Ortiz is not any legal mandate but an improper agreement between DOCCS and DHS.  DOCCS's arrangement with DHS exists to enable the City to claim that, because it has not turned away any homeless persons appearing at its intake sites seeking shelter, it is complying with its consent decree.  DOCCS's deprivation of Messrs. Johnson and Ortiz's right to live in compliance with SARA outside the walls of a correctional facility—in order to allow a different agency to avoid a clearly established legal obligation—amounts to unlawful and "arbitrary, wrongful government action[]" in violation of the Due Process Clause (*Zinermon v Burch*, 494 US 113, 125 [1990]).

As set forth in Part I.A., New York City's 1981 consent decree gives homeless persons the right to shelter provided by the City, so long as the person is without means, in need of housing, and shows up at an intake center.  That decree binds the City and DHS (*see infra* at 2-5).  It is a court order, enforceable by the court's contempt power (*see*

---

fundamental right of parents to make decisions concerning the care, custody, and control of their children"]; *Moore v City of East Cleveland*, 431 US 494, 503, 504 [1977] [constitutional protections for the "sanctity of the family" extend even beyond "the nuclear family," as "(t)he tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition"]).

*generally Badgley v Santacroce*, 800 F2d 33, 37 [1986], *cert denied* 479 US 1067 [1987] [reversing the district court's denial of inmates' motion to hold county correctional officers in contempt for violation of a consent judgment to reduce prison overcrowding, and rejecting the county officials' defense that compliance was impossible without state officials' assistance, where compliance was "hindered by political difficulties rather than physical impossibilities"]).  Whether thought of as a court order or a contract, DOCCS's knowing interference with that decree—by barring sex offenders entitled to parole or on PRS from holding the City to its obligation—is unlawful.  In addition, Department of Social Services regulations make plain that "[a]ll social services districts are required by statute, regulation and directive to arrange temporary housing assistance for eligible homeless individuals, including those who are sex offenders" (18 NYCRR 352.36 [a] [4] [iii]; *see also Gonzalez*, 32 NY3d at 489 [Wilson, J., dissenting]).  Simply put, New York law and the *Callahan* consent decree establish a legally enforceable right to temporary shelter for homeless individuals, including sex offenders, in New York City.

DOCCS does not contest that homeless sex offenders have a legal right to shelter in New York City.  Before the habeas court, DOCCS responded to Mr. Ortiz's claim that New York City is a right-to-shelter city not by challenging that right, but rather by objecting that "spaces in one of the New York City DHS facilities are scarce."  DOCCS's sole justification for its refusal to release Mr. Ortiz is its speculation that New York City might not provide Mr. Ortiz with a SARA-compliant shelter bed.  However, the City has an unequivocal legal obligation to provide every eligible homeless individual with temporary shelter meeting his or her needs pursuant to the *Callahan* consent decree.  Thus, contrary

to the majority's suggestion that DOCCS could not plausibly "have relied on [DHS's] obligation" under the consent decree (majority op at 19), DOCCS has no basis *not* to rely on DHS's obligation to provide shelter to eligible applicants.[11]  A settlement entered as a consent decree "operates as a binding contract" which the parties must follow and which "the courts are bound to enforce" (*Childs v Levitt*, 151 AD2d 318, 320 [1st Dept 1989], *lv denied* 74 NY2d 613 [1989]).  DOCCS's speculation that a court order will not be enforced does not provide a constitutional basis for confinement.

Moreover, it requires no leap of faith to conclude that if DOCCS had not prohibited Mr. Johnson and Mr. Ortiz from presenting themselves at a shelter intake, the City would have found them shelter beds.  The consent decree requires the City to maintain facilities that accommodate the differential needs of its clientele (*see People ex rel. Bonilla v. Superintendent*, Decision & Order, Index No. 2020/51174 [Sup Ct, Dutchess County June 25, 2020] [noting that the consent decree requires DHS to provide SARA-compliant shelter to homeless sex offenders]; *Butler v City of New York*, No. 15-cv-3738, Stipulation of Settlement at 7 [SDNY May 15, 2017], *available at* https://www.coalitionforthehomeless.org/wp-content/uploads/2017/08/Butleretalv_CityofNewYorketal_15-CV-3783-

---

[11] Justice Acker's decision in a separate habeas corpus proceeding confirmed DHS's position that it is required to provide SARA-compliant shelter to those in need (*see People ex rel. Bonilla v. Superintendent*, Decision & Order, Index No. 2020/51174 [Sup Ct, Dutchess County June 25, 2020] ["(I)f a person who required SARA compliant housing presented to a DHS shelter, DHS cannot deny them and must find them a SARA compliant bed (under the *Callahan* consent decree)"]).  DOCCS need not rely on DHS officials' statements about the scope of the City's responsibilities, however, given the City's clear obligation to provide shelter.

StipulationofSet.pdf [requiring DHS to "provide Reasonable Accommodations on an individualized basis" to shelter applicants with disabilities "in a manner that provides for meaningful access to shelter or shelter-related services"]). The City shelters 57,660 homeless individuals each night,[12] and DOCCS cannot credibly claim that a City of 8.5 million people lacks the resources to comply with the decree's obligation to find or create SARA-compliant housing for 295 more people. At any rate, because the City's mandate to provide temporary shelter to any homeless individual who appears at intake, on any given day, does not turn on funding levels or vacancy rates, DOCCS's speculation about the shelter system's actual capacity (and its inability to adapt to changing demand) provides no basis for DOCCS to assume that the City would abdicate its legal obligation.

The City's obligation to use any means at its disposal to provide shelter to homeless individuals who present at intake cannot seriously be questioned, nor is that question even necessary to resolve this appeal (although a basic belief in the rule of law is undeniably sufficient to do so). Fundamentally, Mr. Johnson and Mr. Ortiz were denied freedom not on the basis of DOCCS's statutory authority to impose conditions on parole and PRS, nor

---

[12] The number of people in DHS shelters each night fluctuates seasonally by a margin much greater than the number of SARA-restricted individuals on DOCCS's waitlist (*see* Coalition for the Homeless, *New York City Homelessness: The Basic Facts* (Oct. 2020), *available at* https://www.coalitionforthehomeless.org/wp-content/uploads/2020/10/NYCHomelessnessFactSheet8-2020_citations.pdf [reporting that there were 57,660 homeless people in City shelters each night in August 2020]; *DHS Data Dashboard – Fiscal Year 2020 – QTR 3*, *available at* https://www1.nyc.gov/assets/dhs/downloads/pdf/dashboard/tables/FYTD20-DHS-Data-Dashboard-Data.pdf [reporting over 60,000 individuals in City shelters in November and December of 2019]).

because of any violation of those conditions on the petitioners' part, nor because DOCCS lacked any alternatives besides indefinite confinement to achieve SARA compliance.

Instead, Mr. Johnson and Mr. Ortiz were held in confinement for years beyond their release dates because of DOCCS's agreement with DHS to restrict the flow of homeless sex offenders to City shelters. That agreement exists to allow the City to maintain fictive compliance with its obligation to provide shelter, and is therefore precisely the type of "arbitrary governmental action" the Due Process Clause forbids (*Foucha v Louisiana*, 504 US 71, 80 [1992]).

As the record in this case demonstrates, DOCCS and DHS maintain an arrangement whereby DOCCS limits the number of SARA-restricted individuals it releases from correctional facilities to DHS's SARA-compliant shelters each month, and DOCCS keeps a lengthy internal waitlist of those seeking SARA-compliant shelter (*see People ex rel. Johnson v Superintendent*, 174 AD3d 992, 996 [2019] [Garry, P.J., concurring] [DOCCS represented that as of April 2019 "approximately 295 prisoners" were on the waitlist and the "average waiting time for placement in a SARA-compliant shelter was approximately two to three years"]; *Gonzalez*, 32 NY3d at 489 [Wilson, J., dissenting]; *Alcantara v Annucci*, 55 Misc 3d 1216[A], 2017 WL 1838729 at *10 [Sup Ct, Albany County Feb. 24, 2017]; *People ex rel. Bonilla v Superintendent*, Decision & Order, Index No. 2020/51174 [Sup Ct, Dutchess County June 25, 2020] ["(T)here is an agreement between DHS and DOCCS, where DHS reserves 10 SARA compliant beds per month for inmates being released by DOCCS"]). The placement of SARA-restricted individuals does not depend solely on the time they have spent on the waitlist, as DOCCS prioritizes the release of

individuals serving their PRS terms in RTFs over parole grantees' release from prison. DOCCS arranges for a parole officer from the RTF to escort releasees at the front of the waitlist to intake at DHS's Bellevue Men's Shelter in New York City and then to their assigned DHS locations.[13] DOCCS's cooperation with DHS serves a convenient purpose of allowing DHS to control access to shelter space; it does not alter the City's obligations under the *Callahan* consent decree to provide shelter to homeless individuals.

The effect of the DOCCS-DHS arrangement is to extend the incarceration of SARA-restricted homeless individuals—potentially for life, for those in Mr. Johnson's position, and for an indefinite period beyond their maximum prison sentence, for those in Mr. Ortiz's position—solely because DOCCS has barred them from obtaining the SARA-compliant housing to which they are legally entitled. The circumstance is not much different than if Mr. Ortiz or Mr. Johnson had a signed, fully paid-up lease for a SARA-compliant apartment, but DOCCS and the landlord agreed that the landlord would dishonor the lease. The one difference is that instead of a lease, Messrs. Ortiz and Johnson have a court order.

---

[13] Since its change of policy in 2014, DOCCS maintains the position that Bellevue Men's Shelter is not SARA-compliant because of its proximity to school grounds, and claims that it may not permit SARA-restricted individuals to present themselves at Bellevue under DOCCS's escort where there is a risk that those individuals would have to stay a few weeks at Bellevue before a SARA-compliant shelter bed became available (*see Matter of Allen v. Annucci*, Index No. 8224-17, Decision & Judgment [Sup Ct, Albany County May 8, 2018]). In effect, DOCCS selectively tolerates SARA-restricted individuals' knowing entry within 1,000 feet of school grounds when they appear at Bellevue Men's Shelter to claim a bed set aside under DOCCS's agreement with DHS, but DOCCS bars SARA-restricted individuals from appearing at Bellevue to invoke their right to shelter. DOCCS's position exemplifies the arbitrariness inherent in its interpretation of SARA's school grounds condition.

Finally, in light of the City's obligation to provide SARA-compliant shelter, DOCCS's stated rationale for depriving Messrs. Johnson Ortiz of liberty—DOCCS's own obligation to foster compliance with SARA—collapses. The expectation that Messrs. Johnson and Ortiz would violate the conditions of their release, when the City was legally bound to secure SARA-compliant beds for them, was not a lawful basis for DOCCS to deny them an immediate opportunity to present themselves at a shelter intake. Neither Mr. Johnson nor Mr. Ortiz asserts a right to be free from SARA's residency restriction or New York's regulatory scheme for parole and PRS. Rather, each petitioner asserted a right to live in compliance with SARA and their respective parole and PRS conditions, outside the confines of a correctional facility, in a right-to-shelter city. Thus, even under the majority's theory that Messrs. Johnson and Ortiz's liberty interests were not fundamental, the *Callahan* consent decree gave the petitioners a legally enforceable interest—an unequivocal right to seek temporary shelter—that, at the very least, could not be denied arbitrarily (*see generally Mathews v Eldridge*, 424 US 319, 335 [1976]; *Goldberg v Kelly*, 397 US 254, 262-263 [1970]; *Matter of Uniform Firefighters of Cohoes, Local 2562, IAFF, AFL-CIO v City of Cohoes*, 94 NY2d 686, 691-692 [2000]).[14] DOCCS's bargain with the

_____

[14] The irrationality of DOCCS's actions are further demonstrated by the modest steps needed for Mr. Ortiz to exercise his *Callahan* right. Mr. Ortiz requested release to the Bellevue Men's Shelter so that he could claim shelter, as is his right. The drive from Queensboro Correctional Facility to Bellevue is 11 minutes via the Queens Midtown Tunnel (*see* Google Maps, www.google.com/maps, last accessed Nov. 6, 2020) (our Court may take judicial notice of Google Maps) (*see e.g. Pahls v Thomas*, 718 F3d 1210, 1216 n 1 [10th Cir 2013]; *United States v Perea–Rey*, 680 F3d 1179, 1182 n 1 [9th Cir 2012]; *Connor v City of New York*, 29 Misc 3d 1208(A) [Sup Ct, NY County 2010]). For want of an 11-minute drive (maximum 26, with traffic), Mr. Ortiz was held for more than two years past his parole date, at a cost to New York State taxpayers of tens of thousands

City to shield it from the consequences of violating its legal obligations would be laughable if advanced as a rational basis for DOCCS's refusal to allow the petitioners to apply to the City for shelter once they gained an expectation of release. Accordingly, DOCCS's preemptive, indefinite confinement of the petitioners violated their substantive due process right to be free from arbitrary governmental action.

The correct result here is simple. Convicted sex offenders who have served their time and are entitled to release, supervised or otherwise, cannot constitutionally be detained by one arm of government because another arm of government might be held to its court-ordered responsibilities. The writ of habeas corpus has existed for centuries so that courts may free those wrongfully held by executive authority. We make a mockery of the writ when we justify the unlawful detention by letting two executives point the finger at each other, or one justify its actions because it believes the other will violate the law. [15]

---

of dollars per year. Even a small probability of success warranted, at a minimum, an escorted visit for Mr. Ortiz to invoke his *Callahan* right in the manner required by the consent decree.

[15] Because I would reverse the decisions of the Appellate Division on due process grounds, I do not discuss Mr. Ortiz and Mr. Johnson's Eighth Amendment claims, which are more complex. However, their cases raise colorable Eighth Amendment concerns similar to those recognized by courts in many other jurisdictions, which have found residency restriction laws punitive in effect (*see e.g. Does #1-5 v Snyder*, 834 F3d 696 [6th Cir 2016]; *Starkey v Oklahoma Dept. of Corrections*, 2013 OK 43, 305 P3d 1004 [2013]; *Commonwealth v Baker*, 295 SW3d 437 [Ky 2009]), or unconstitutional insofar as they punish involuntary conduct inseparable from homelessness and poverty (*see e.g. State v Adams*, 91 So 3d 724 [Ala Crim App 2010]; *Murphy v Raoul*, 380 F Supp 3d 731 [ND Ill 2019]).

Case No. 74:

Order modified, without costs, by converting the proceeding into a declaratory judgment action and granting judgment in accordance with the opinion herein and, as so modified, affirmed. Opinion by Judge Fahey.  Chief Judge DiFiore and Judges Stein, Garcia and Feinman concur.  Judge Rivera dissents in an opinion.  Judge Wilson dissents in a separate dissenting opinion.

Case No. 75:

Order modified, without costs, by converting the proceeding into a declaratory judgment action and granting judgment in accordance with the opinion herein and, as so modified, affirmed. Opinion by Judge Fahey.  Chief Judge DiFiore and Judges Stein, Garcia and Feinman concur.  Judge Rivera dissents in an opinion.  Judge Wilson dissents in a separate dissenting opinion.


Decided November 23, 2020